MOUNTBATTEN SURETY COMPANY, INC., Plaintiff-Appellee, v. SZABO CONTRACTING, INC., *et al.*, Defendants-Appellants.

Second District   No. 2—03—0171

Opinion filed June 17, 2004.

Thomas J. Keevers and Scott D. Barber, both of Riffner, Barber & Scott, P.C., of Schaumburg, for appellants.

James P. DeNardo, William S. Piper, Kristin Dvorsky Tauras, and Tracy McGonigle, all of McKenna Storer, of Chicago, for appellee.

PRESIDING JUSTICE O'MALLEY delivered the opinion of the court:

Defendants Szabo Contracting, Inc., Szabo Construction, LLC, Frank Szabo, Jr., James C. Szabo, Carla Szabo, and Carl F. Szabo appeal the order of the circuit court of Du Page County granting summary judgment in favor of plaintiff, the Mountbatten Surety Company, Inc., and awarding plaintiff a judgment totaling $763,544.31. Defendants argue that (1) plaintiff did not properly plead and

demonstrate that its right to be indemnified by defendants under a general indemnity agreement (Agreement) had been triggered by a default on an underlying bond, (2) that the attorney fees awarded plaintiff by the trial court were not reasonable, and (3) that the trial court abused its discretion in denying defendants leave to plead over and to file affirmative defenses. We affirm.

The following undisputed facts are taken from the record on appeal. In 1993, Szabo Contracting, Inc. (SCI), began its business as a general contractor and focused on municipal projects. In 1998, defendants executed a general indemnity agreement with plaintiff whereby plaintiff was to provide performance and payment bonds on various projects that SCI undertook for its municipal clients.

Plaintiff is a Pennsylvania insurance company that is authorized to transact insurance and surety business in Illinois. Plaintiff issued a number of performance and payment bonds on behalf of SCI and in favor of various state and municipal entities for public works projects in which SCI was acting as a contractor. These projects included a contract with the Village of South Barrington, four contracts with the Village of Lombard, a contract with Du Page County, two contracts with the City of Aurora, a contract with the Village of Bloomingdale, a contract with the Illinois Department of Natural Resources, and a contract with the Village of Melrose Park. The combined total of the performance and payment bonds issued by plaintiff was over $16 million. On February 16, 1998, all defendants separately and severally executed the Agreement. The Agreement provided:

> "The Indemnitors [defendants] hereby jointly and severally covenant, promise and agree to exonerate, indemnify and save harmless the Surety [plaintiff] (and any surety the Surety procures to execute any Bond and any other surety with which Surety may act as co-surety on any Bond or other instrument) from and against any and all liability, loss, cost, damage and expense of whatsoever kind or nature (including but not limited to, interest, court costs and counsel, consulting, accounting and other professional fees) which the Surety may sustain, incur, be put to or to which it may be exposed (1) by reason of having executed any Bond or other instrument or any renewal, modification, continuation, substitution or extension thereof, (2) by reason of the failure of the Principal or any of the other Indemnitors to perform or comply with the promises, covenants and conditions of this Agreement or, (3) in enforcing any of the promises, covenants or conditions of this agreement."

In addition, the Agreement provided:

> "The liability of the Indemnitors [defendants] shall extend to and include the amount of all payments, together with interest

thereon, from the date of such payments, made by the Surety [plaintiff] in good faith under the Surety's belief that (1) the Surety was or might be liable therefor, or (2) the payments were necessary or advisable to protect any of the Surety's rights or to avoid or lessen the Surety's liability or alleged liability."

Additionally, defendants agreed to collateralize any reserve established by plaintiff in the anticipation of a loss on any of the bonds it issued. If defendants failed to deposit sufficient collateral after plaintiff made a collateral demand, then defendants' failure constituted a default under the Agreement, triggering plaintiff's rights under the Agreement to obtain injunctive relief to compel defendants to deposit sufficient collateral, or to obtain a judgment against defendants for the amount of the collateral demanded plus costs and attorney fees.

Under the Agreement, defendants also agreed to assign, transfer, pledge, and convey to plaintiff as collateral security various rights of defendants in any and all sums due or to become due under any contract; all subcontracts and purchase orders; all interest in any contract, the work, or tools and supplies; and all other personal property. Paragraph 9 of the Agreement provided that the rights defendants assigned to plaintiff could be exercised by plaintiff as follows:

"(E) The rights provided to the Surety [plaintiff] under the assignments herein granted may be exercised by the Surety immediately on the occurrence of any one or more of the following events or upon the [S]urety's reasonable apprehension that any one or more of the following may occur:

(1) Any abandonment, forfeiture, or breach of, or failure, refusal or inability to perform, the terms and provisions of any contract with respect to which a Bond or other instrument has been executed by Surety;

(2) The failure, delay, refusal or inability of the Principal to pay bills or other indebtedness incurred in, or in connection with, the performance of any contract with respect to which a Bond or other instrument has been executed by Surety;

(3) The failure, refusal or inability of the Principal to satisfy any of the conditions of any such Bond or other instrument executed by Surety;

(4) The failure to perform, or comply with, any of the promises, covenants, and obligations of this Agreement;

(5) The failure to pay and discharge, when due, any other indebtedness of the Principal to the Surety;

(6) Any assignment by the Principal for the benefit of creditors, any appointment or application for the appointment of a receiver or trustee, or any voluntary or involuntary filing of a

petition under Title 11 of the United States Code as to any Indemnitor whether insolvent or not;

(7) Any proceeding which deprives the Principal of the use or interferes with the Principal's use of any supplies, tools, plant, machinery, equipment or materials required for the performance of any contract with respect to which Surety has issued any Bond; or

(8) The Principal's death, disappearance, incompetence, conviction of a felony, or imprisonment, if the Principal is an individual.

(F) In the event the assignments become operative as provided above, in addition to any other remedies the Surety may have, the Indemnitors authorize and empower the Surety in its sole discretion and to the extent it deems appropriate, but without any obligation to take action:

(1) To assert, pursue, prosecute, compromise or settle in whole or in part at the Indemnitors' expense all of the rights, actions, causes of action, claims and demands assigned, and

(2) To take possession of all or any part of the work (together will all associated supplies, tools, plant, machinery, equipment, materials, job books, records, drawings and plans), at the Indemnitors' expense to complete all or any part of the work, or to relet or consent to the reletting or completion of the contract or contracts secured by any Bond."

The Agreement further provided that the contract funds were to be treated as trust funds:

"If any of the Bonds or other instruments are executed by the Surety in connection with the performance of a contract, the entire contract price or other consideration to be received by the Principal, whether received as payments or loans, shall be dedicated to the satisfaction of the conditions of the Bond(s) or other instrument(s). All consideration, including all funds paid, due or to become due and all securities, warrants, checks or other evidence of indebtedness and the proceeds thereof, given upon or under any contract in connection with which the Surety shall have issued a Bond shall be impressed with a trust in favor of laborers, materialmen, suppliers, subcontractors and the Surety for the exclusive purpose of satisfying the conditions of the Bonds. Upon demand of the Surety for the deposit therein of all funds or the proceeds of all consideration received or to be received from any contract referred to in any Bond."

Early in 1999, plaintiff became aware of claims submitted by SCI's subcontractors for nonpayment and the Village of South Barrington's complaint regarding SCI's performance. On February 23, 1999, HMS Dreadnought, an entity related to plaintiff, wrote to the Village of

South Barrington acknowledging receipt of the village's complaint and other claims made against the payment bond. HMS Dreadnought "demand[ed], on behalf of the Surety [plaintiff] that [the Village of South Barrington] release no further funds under the above-referenced contract without the in-advance written consent and direction of the Surety or HMS Dreadnought, Inc." HMS Dreadnought made the demand "to protect the Surety's rights of subrogation and to enable the Surety to protect its interests under its Bonds furnished for this project." On March 11, 1999, R.W. Dunteman Company, a subcontractor in the Lombard project, filed suit against SCI for failing to pay it sums due under its contract with SCI. On March 23, 1999, plaintiff sent letters to the other municipalities that had outstanding contracts with SCI, insisting that contract funds be escrowed and sent to plaintiff's designated disbursing agent. These letters also indicated that plaintiff was proceeding to exercise its rights as afforded by the Agreement.

On April 1, 1999, Frank Szabo met with representatives of plaintiff and HMS Dreadnought at plaintiff's offices in Pennsylvania. According to Frank Szabo's affidavit, plaintiff and he reached an accord by which plaintiff would retract the letters sent to the various public owners and withdraw its demand for escrowing amounts paid in on the other bonded jobs. No such written agreement appears in the record; the Agreement specifies that its provisions may be waived or modified only in writing, and not orally. On April 19, 1999, plaintiff's corporate counsel, Gerald Carozza, again advised defendants that plaintiff had received notice of claims, reminded defendants that the various contract funds were considered trust funds under the Agreement, and advised defendants that plaintiff had set up a $500,000 reserve for which it was demanding a deposit of collateral security.

Plaintiff further requested that defendants arrange to deposit all of the funds into a separate trust account and to escrow the contract funds for the purpose of paying the subcontractors and suppliers. Defendants neither created nor agreed to create an escrow for the contract funds or a separate trust account. On April 28, 1999, plaintiff filed suit. In count I, plaintiff sought exoneration, specific performance, and indemnity. In count II, plaintiff alleged *quia timet* and sought injunctive relief. Concurrently with the complaint, plaintiff filed a motion for a temporary restraining order.

On May 4, 1999, defendants filed a counterclaim for injunctive relief, alleging that plaintiff had unjustifiably interfered with defendants' contracts. Also on that date, the trial court was scheduled to hear plaintiff's motion for a temporary restraining order. However, the parties agreed to the entry of an order providing that defendants'

counsel would set up a segregated trust account into which the contract funds would be deposited and paid out to SCI's subcontractors and suppliers who made requests. If the parties were unable to agree upon a payout, then they were to bring an appropriate motion before the trial court. Additionally, the agreed order provided that plaintiff was to rescind its notices to the various municipalities demanding that they make payments directly to plaintiff, advise them of the agreed order, and direct them to make the payments into the trust account created by the agreed order.

Thereafter, the terms of the agreed order were implemented. Further, on June 15, 1999, pursuant to a motion by plaintiff that alleged that the payables to subcontractors and suppliers exceeded receivables for several projects, the terms of the agreed order were extended by stipulation of the parties.

Between May and September 1999, a substantial amount of the contract funds was received into the trust account and disbursed to SCI's subcontractors and suppliers on the various projects. During that time, plaintiff filed a motion to strike and dismiss defendants' counterclaim, and defendants filed a motion to dismiss count II of plaintiff's complaint. On September 9, 1999, the trial court entered an agreed order extending the terms of the May 4, 1999, order establishing the segregated trust account. The trial court also took the motions directed at the pleadings under advisement. The trial court also allowed defendants to voluntarily dismiss their counterclaim. Also on September 9, 1999, defendants filed a new counterclaim, alleging a racketeering violation, a consumer fraud violation, intentional injury, and breach of the covenant of good faith and fair dealing. This counterclaim was later consolidated with plaintiff's complaint.

On October 12, 1999, SCI executed a trust agreement and assignment for the benefit of creditors with William A. Brandt, Jr., of Development Specialists, Inc. On October 13, 1999, Brandt advised plaintiff of the assignment and stated that "all work on jobs in progress has stopped and will not be completed by [SCI], Szabo Construction LLC or Coral Leasing." On October 20, 1999, plaintiff filed a motion to terminate the joint-control trust account created by the May 4, 1999, order and to otherwise modify the terms of the preliminary injunction, as a result of defendants' assignment for the benefit of creditors. Plaintiff further contended that defendants had abandoned their various bonded projects, which constituted a default under paragraph 9(E)(1) of the Agreement. On this date, plaintiff also filed a motion for restitution against defendants on the basis that defendants had acted fraudulently and in violation of the Mechanics Lien Act (770 ILCS 60/0.01 *et seq.* (West 2002)) by obtaining funds

from Du Page County with false contractor affidavits and requiring subcontractors to provide lien waivers without actually receiving payment. Plaintiff also filed a motion to dismiss defendants' new counterclaim.

On October 20, 1999, the trial court granted leave to intervene to West Suburban Bank and Brandt. West Suburban Bank made loans to SCI and claimed a priority interest in all of SCI's accounts receivable, including the segregated trust account. West Suburban filed a response to plaintiff's motion to terminate the joint-control trust account and also a cross-complaint for declaratory judgment, asserting the priority of its interest in those funds. Subsequently, Du Page County was allowed to intervene and filed a cross-complaint for declaratory judgment, alleging that SCI stopped working on the Du Page County project on October 12, 1999, and that Brandt, as assignee for the benefit of creditors, gave notice that he would not complete the project. Du Page County acknowledged that plaintiff gave notice of its intent to fulfill its obligations under the bond for the project, and acknowledged that there was a competing interest in the contract funds by West Suburban under a security agreement with SCI. Du Page County sought an adjudication of the priority of the various parties in interest.

Plaintiff moved to dismiss West Suburban's cross-complaint, asserting that, because of SCI's defaults under the Agreement, including its assignment for the benefit of creditors, its interest in the remaining contract funds on the bonded projects had priority over the bank's interests. However, on January 20, 2000, activity in this case was stopped following SCI's filing for bankruptcy. In November 2000, the bankruptcy court granted plaintiff relief from the automatic stay and allowed plaintiff to "collect all contract proceeds on projects bonded by it," and "to utilize said funds to complete bonded obligations or to otherwise direct said public owners to use said funds to discharge obligations, under the bond." At that point, Brandt, as assignee, withdrew from the litigation. The trial court thereafter held a pretrial conference, at which plaintiff provided a list of all outstanding claims on the projects.

On February 16, 2001, the trial court granted plaintiff's motion to dismiss West Suburban's cross-complaint. The trial court specifically found that the surety's interests in the bonded contract accounts receivable and the court-ordered trust account were superior to the bank's interest under the Uniform Commercial Code (810 ILCS 5/1—101 *et seq.* (West 2000)). Also on February 16, 2001, the individual Szabo defendants retained new counsel following the death of their original counsel while the case was inactive under the automatic

bankruptcy stay. On February 20, 2001, the trial court entered an agreed order allowing the funds held in the segregated trust account to be disbursed to the claimants from the various projects, with the remaining amount to be disbursed to plaintiff as partial reimbursement for claims it had already paid.

West Suburban appealed the dismissal of its cross-complaint. Thereafter, West Suburban voluntarily dismissed its appeal.

SCI continued to insist that the contract funds be sent to West Suburban. On April 9, 2002, plaintiff filed a motion to enjoin SCI from interfering with the collection of the funds. The Village of Lombard joined in plaintiff's motion. The trial court granted the motion.

Also on April 9, 2002, plaintiff filed its motion for summary judgment. Plaintiff itemized the claims paid to SCI's subcontractors and suppliers under the payment bond. Plaintiff further detailed its takeover agreement with Du Page County to complete the contract. Plaintiff also settled claims from the Villages of Bloomingdale and Lombard and paid the claims of certain subcontractors. Finally, plaintiff detailed its expenses, including attorney fees. In all, plaintiff claimed that it was due over $1 million.

Defendants sought and received leave to take additional discovery depositions before their response to the motion for summary judgment was due. Although defendants issued subpoenas to various witnesses, their depositions never occurred because defendants ultimately failed to comply with the trial court's scheduling order on the additional discovery. Defendants then filed their response to the motion for summary judgment, supported by the affidavit of Frank Szabo. Plaintiff filed its reply and a motion to strike Frank Szabo's affidavit on the ground that it was conclusory.

On October 31, 2002, the trial court held a hearing on plaintiff's motion for summary judgment. First, the trial court ruled on the motion to strike Frank Szabo's affidavit. The trial court struck certain paragraphs of the affidavit, ruling that they were conclusory and not supported by facts. The trial court then proceeded to rule on plaintiff's motion for summary judgment. The trial court first noted that plaintiff had demanded that defendants deposit collateral, but that defendant failed to deposit any of the collateral demanded. The trial court determined that, under paragraph 6 of the Agreement, this constituted a default. The trial court also noted that plaintiff had received a notice of cancellation of SCI's workers' compensation insurance. The trial court further noted that, under the Agreement, plaintiff was entitled to exercise its rights if it had a reasonable apprehension that defendants would be unable to perform. The trial court stated that the cancellation of the workers' compensation insurance gave rise to a

reasonable apprehension that defendants would not be able to perform. The trial court concluded that, under the agreement, defendants had defaulted in at least two instances: the failure to comply with the demand for collateral and the notice of cancellation of the workers' compensation insurance.

The trial court considered defendants' argument that plaintiff had not acted in good faith. It concluded that the undisputed facts did not demonstrate that plaintiff had acted fraudulently or in bad faith, and that defendants had failed to make the necessary showing to prevail on that argument.

The trial court also concluded that plaintiff did not need to show that defendants breached a performance and payment bond in order to bring this action. It held that proving a default under the Agreement was sufficient. The trial court therefore entered summary judgment in favor of plaintiff and against defendant. With regard to attorney fees, the trial court found no dispute regarding the reasonableness of the rate charged by plaintiff's attorneys and determined that the documentation provided by plaintiff was sufficient and represented a very reasonable amount. The trial court also ordered that defendants deposit collateral in the amount of $600,000 to offset the outstanding liability to plaintiff on certain of the bonds. In the event that defendants did not comply, the court authorized an additional judgment of $600,000. The trial court also permitted plaintiff to file a petition for additional attorney fees.

On December 2, 2002, following defendants' failure to make the $600,000 collateral deposit, plaintiff moved for entry of the additional judgment and filed a petition for additional attorney fees. On that date, defendants also filed a motion to reconsider the ruling on summary judgment. On January 17, 2003, the trial court denied defendants' motion to reconsider. On March 7, 2003, the trial court ruled on the pending motion for entry of the additional judgment and the petition for additional attorney fees. The court entered an additional judgment in the amount of $545,020.19 and allowed additional attorney fees in the amount of $47,278.27. Defendants timely appeal.

On appeal, defendants identify four primary issues. First, defendants contend that the trial court erred in holding that plaintiff was not required to plead and prove a breach of the performance and payment bond as a condition precedent to bringing a claim under the Agreement. Next, defendants assert that several material issues of fact preclude the entry of summary judgment. These factual issues include whether plaintiff had a reasonable apprehension of or actual exposure to a claim under one of the performance and payment bonds, whether plaintiff's own actions caused claims to be made under the

bonds, and whether plaintiff acted in good faith in paying the claims for which it is seeking indemnification. Third, defendants also complain that the trial court's award of attorney fees was not reasonable. Last, defendants contend that the trial court abused its discretion in not allowing defendants to replead and raise affirmative defenses.

■ Before we consider defendants' issues on appeal, we must first address a number of motions we ordered to be taken with the case. Initially, plaintiff filed a motion to strike portions of defendants' brief on appeal, contending that defendants based one of their arguments on several letters authored by Marc Roth that were not a part of the appellate record. Defendants failed timely to reply to plaintiff's motion. Thereafter, defendants filed a motion for leave to file a response to plaintiff's motion to strike along with a motion to supplement the record on appeal with the transcripts of three hearings in the trial court and the deposition of Marc Roth. This court allowed defendants' motion to supplement the record on appeal. Plaintiff thereafter filed objections to defendants' motion for leave to file a response to plaintiff's motion to strike. Upon examining the supplemental record, we find that it contains copies of the letters authored by Marc Roth that are referred to in defendants' argument on appeal. Accordingly, we deny plaintiff's motion to strike and defendant's motion for leave to file a response to plaintiff's motion to strike.

Before addressing defendants' substantive arguments on appeal, we briefly rehearse the standards governing our review of the trial court's grant of summary judgment. Summary judgment is a drastic means of disposing of a case; consequently, we must construe the record strictly against the moving party and liberally in favor of the nonmoving party. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 423-24 (1998). Summary judgment will be granted if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" (735 ILCS 5/2—1005(c) (West 2002)) and "the moving party's right to judgment is clear and free from doubt" (*Jackson*, 185 Ill. 2d at 424). Where there is a dispute regarding a material fact, or where reasonable persons could draw different inferences from the undisputed fact, then summary judgment is improper, and the issue must be decided by the trier of fact. *Jackson*, 185 Ill. 2d at 424. Our review of the trial court's grant of summary judgment is *de novo*. *Jackson*, 185 Ill. 2d at 424.

Turning to the substantive issues raised by defendants, defendants first contend that the trial court erred in interpreting the Agreement not to require, as a condition precedent, the breach of the provisions of any of the performance and payment bonds to entitle plaintiff to

exercise its rights under the Agreement. Defendants point only to the provision of the Agreement that obligates them to indemnify plaintiff if it incurs or is exposed to liability, loss, or damage "by reason of having executed any [performance and payment] bond" on behalf of defendants. Defendants suggest that this is the only provision in the Agreement that will trigger their indemnity obligation to plaintiff. Because there was no allegation or evidence presented by plaintiff that any of the municipalities claimed a default under any performance and payment bond, defendants conclude that their obligations under the Agreement never sufficiently ripened to allow plaintiff to take any of the actions allowed by the Agreement. We disagree.

■ We note, initially, that an indemnity agreement is a contract and is subject to the rules for interpreting contracts. *Hanover Insurance Co. v. Smith*, 182 Ill. App. 3d 793, 796 (1989), *aff'd*, 137 Ill. 2d 304 (1990). In construing a contract (or an indemnity agreement), the cardinal rule is to give effect to the intention of the parties. *Hanover Insurance*, 182 Ill. App. 3d at 796. The intent of the parties is discerned from the language used in the contract, which will be given its plain and ordinary meaning unless it is ambiguous. *United States Fidelity & Guaranty Co. v. Klein Corp.*, 190 Ill. App. 3d 250, 254 (1989) (hereinafter, *USF&G*).

■ Here, defendants do not contend that the Agreement is in any way ambiguous; to the contrary, defendants argue that it clearly requires the breach of one of the underlying bonds as a condition precedent to allow plaintiff to enforce the obligations of the Agreement. Defendants' argument, however, misrepresents the nature of the obligations that they undertook. Defendants' claim that a breach of the provisions of an underlying bond is the only manner by which their obligations and plaintiff's rights under the Agreement may be triggered ignores the fact that it is only one of three explicit alternatives. Stated in full, the Agreement provides that defendants will indemnify plaintiff for:

> "any and all liability, loss, cost, damage and expense of whatsoever kind or nature (including but not limited to, interest, court costs and counsel, consulting, accounting and other professional fees) which the Surety may sustain, incur, be put to or to which it may be exposed (1) by reason of having executed any Bond or other instrument or any renewal, modification, continuation, substitution or extension thereof, *(2) by reason of the failure of the Principal or any of the other Indemnitors to perform or comply with the promises, covenants and conditions of this Agreement or, (3) in enforcing any of the promises, covenants or conditions of this agreement.*" (Emphasis added.)

The Agreement expressly provides that a breach of an underlying bond, or a default under or breach of the terms of the Agreement itself, is sufficient to allow plaintiff to exercise the rights specified in paragraph 9 of the Agreement. Thus, the trial court rightly concluded that a default under the terms of the Agreement itself, without a breach of an underlying bond, triggered plaintiff's rights to indemnification from defendants. Accordingly, we reject defendants' assertion that "[o]nly if [plaintiff] is exposed to liability under the [performance and payment] bonds does the [d]efendants' obligation under the [Agreement] get triggered." Further, we note that plaintiff demanded a collateral deposit and defendants did not comply, which constituted a default under the Agreement, thereby allowing plaintiff to invoke its rights and remedies under paragraph 9 of the Agreement.

Moreover, defendants' argument fails on its face. Defendants quote provisions from the performance and payment bonds that state that, in order to trigger the surety's obligation under the bond, an owner-municipality must have declared a contractor default, or a subcontractor or supplier (or a subcontractor of a subcontractor) must have made a claim under the bond against the contractor (defendants). Defendants continue to assert that plaintiff did not prove that any owner-municipality declared a contractor default. This again ignores the alternate basis to trigger plaintiff's obligations under the bond, that a subcontractor or supplier made a claim under the bond. Plaintiff alleged that subcontractors and suppliers had made claims under the bonds and it provided documentary support in its motion for summary judgment. In their response to the motion for summary judgment, defendants sidestepped the question of whether a claim had been made and argued only that plaintiff had not received a notice of default. Defendants did not dispute that plaintiff received claims under the bonds. Under the provisions quoted by defendants, receiving a notice of a claim is sufficient to trigger plaintiff's obligations under the bond. Therefore, the undisputed evidence in the record shows that plaintiff was "exposed" to "liability, loss, cost, damage and expense of whatsoever kind" "by reason of having executed any bond" pursuant to the terms of the Agreement. Thus, even under the ground defendants choose to raise, plaintiff was exposed to liability on a bond, and this validly triggered defendants' obligations under the Agreement.

Defendant also attempts to suggest that a factual issue exists regarding plaintiff's receipt of a notice of cancellation of defendants' workers' compensation insurance policy. Defendants assert that they always maintained workers' compensation insurance by securing replacement coverage upon receiving the notice of cancellation. Even

if an issue of fact exists on this specific ground, our analysis above shows that plaintiff was exposed to liability as a result of issuing bonds on behalf of defendants by virtue of the claims made by the subcontractors and suppliers, and that defendants defaulted under the terms of the Agreement. Thus, because the notice of cancellation of workers' compensation insurance was not the only basis for triggering defendants' obligations under the Agreement, the existence of a factual issue, if any, regarding the notice of cancellation of defendants' workers' compensation policy would be insufficient to preclude the entry of summary judgment.

Next, defendants assert that there were other material issues of fact that should have precluded the entry of summary judgment. First, defendants again assert that a genuine issue of material fact exists regarding whether plaintiff was exposed to a claim by virtue of issuing a bond, because plaintiff did not prove that an owner-municipality declared a contractor default or that a subcontractor or supplier made a claim under a bond. Even accepting that such material issue of fact exists, defendants' analysis once again incorrectly assumes that being exposed to a claim arising from the issuance of a bond is the only manner available to trigger defendants' obligations under the Agreement. As we have seen above, defendants' default or breach of the Agreement is also an occurrence that will trigger defendants' obligations under the Agreement. Plaintiff has shown and defendants do not deny that defendants failed to make a collateral deposit pursuant to plaintiff's request, which constitutes a default under the Agreement sufficient to trigger defendants' obligations and plaintiff's rights under paragraph 9. Thus, the existence of an issue of material fact about whether plaintiff was exposed to liability as a result of executing a performance and payment bond on behalf of defendants will not preclude the entry of summary judgment, as there are other, independent grounds to sustain summary judgment.

Defendants also assert there is an issue of fact regarding whether plaintiff's receipt of the notice that defendants' workers' compensation insurance would be cancelled was sufficient to place plaintiff in reasonable apprehension that defendants would be unable to perform their obligations. According to defendants, reasonable minds could differ about the legal effect on the surety of the receipt of the notice of cancellation. We have carefully examined the record and conclude that any issue regarding defendants' workers' compensation insurance is insufficient to preclude summary judgment.

Defendants claim that their workers' compensation insurance never lapsed because they were able to obtain workers' compensation insurance from another carrier. Consequently, defendants contend

that the notice of cancellation was not sufficient to place plaintiff in reasonable apprehension about defendants' ability to perform its obligations. We note, however, that defendants did not raise this argument until they filed their motion to reconsider the summary judgment. In addition, defendants filed proof of insurance for the first time with their motion to reconsider. Neither this court nor the trial court is required to consider documents attached to a party's motion to reconsider a summary judgment where the party did not file the documents in response to the initial motion for summary judgment. *Sacramento Crushing Corp. v. Correct/All Sewer, Inc.*, 318 Ill. App. 3d 571, 577-78 (2000). We find, therefore, that no genuine issue of material fact exists regarding workers' compensation insurance that is sufficient to preclude the entry of summary judgment.

Defendants also assert that an issue of fact exists regarding whether plaintiff's own conduct led to the claims on the bonds that plaintiff used to justify its enforcement of its rights under the Agreement. Defendants argue that plaintiff's March 23, 1999, letters to the municipalities effectively "shut down" defendants and caused the various subcontractor and supplier claims to be filed. We disagree.

The record demonstrates that, on March 11, 1999, one of defendants' subcontractors, R.W. Dunteman, filed suit against defendants, alleging that they failed to pay it amounts earned under a subcontract. This claim, therefore, was outstanding before plaintiff sent its March 23, 1999, letters. Thus, the letters requiring the municipalities to pay plaintiff and not defendant were issued as a result of at least this claim. In addition, we note that defendants do not bother to attempt to demonstrate the factual basis for their argument, either through citation to the record or even by reciting the dates at which their subcontractors and suppliers made claims for nonpayment. Therefore, we find no merit in defendants' argument.

Defendants next argue that there is a factual question regarding whether plaintiff acted in good faith when it paid the claims for which it is seeking indemnity. Defendants, however, do not cite to any legal authority in support of their argument. Accordingly, as defendants have violated Supreme Court Rule 341(e)(7) (210 Ill. 2d R. 341(e)(7)), we find that they have forfeited our consideration of this issue on appeal. *La Salle Bank, N.A. v. DeCarlo*, 336 Ill. App. 3d 280, 287 (2003). Waiver aside, defendants' argument is nevertheless without merit.

The gist of defendants' argument is that the issue of good faith involves a factual determination. In support, defendants rely on several letters written by Marc Roth about five of the projects that defendants were contracting with various municipalities. Defendants conclude

from the letters that plaintiff resolved liability issues with the municipalities without demanding the full amount due from the municipalities, thereby depriving defendants of their full contractual entitlements. According to defendants, this failure to obtain a larger amount of money means that plaintiff was acting in bad faith toward defendants. The upshot of defendants' argument is that plaintiff has not sufficiently accounted for the funds received under the contract for each project and may have resolved disputes at an artificially low price so as to deprive defendants of moneys to which they are entitled.

The first component of defendants' argument, that the issue of good faith generally presents a factual issue, may or may not be true; defendants have presented no supporting authority for this proposition. Significantly, however, the issue of a surety's good-faith resolution of underlying claims against the indemnitor is susceptible to summary judgment. See, *e.g.*, *USF&G*, 190 Ill. App. 3d at 254-56 (existence of surety's good faith presumed, summary judgment properly granted). Indeed, *USF&G* offers controlling guidance in resolving defendants' argument. In *USF&G*, the defendant, a general contractor that filed for bankruptcy, argued that the plaintiff made payments to the owner in bad faith. *USF&G*, 190 Ill. App. 3d at 252-53. The court noted that the plaintiff did not specifically allege that it had made the payments in good faith and concluded that this "failure to specifically allege good faith" did not "give[ ] rise to an inference that it acted in bad faith." *USF&G*, 190 Ill. App. 3d at 255. The court then noted that the indemnity agreement gave the plaintiff discretion to demand indemnity if it might be liable for payments on an underlying contract. *USF&G*, 190 Ill. App. 3d at 255. The court held that, absent an affirmative showing of fraud or bad faith, the good faith of the plaintiff-surety would be presumed. *USF&G*, 190 Ill. App. 3d at 256.

Here, similarly to *USF&G*, the Agreement vests plaintiff with the discretion to demand indemnity if it has a good-faith belief that it might be liable for a payment on an underlying bond. Specifically, the Agreement provides:

> "The liability of the Indemnitors shall extend to and include the amount of all payments *** made by the Surety in good faith under the Surety's belief that (1) the Surety was or might be liable therefor, or (2) the payments were necessary or advisable to protect any of the Surety's rights or to avoid or lessen the Surety's liability or alleged liability."

Thus, plaintiff is vested with the same discretion the court found in *USF&G*. *USF&G*, 190 Ill. App. 3d at 254-55 (the defendant's liability is for " 'all amounts paid by [the plaintiff] in good faith under the belief that: (1) [the plaintiff] was or might be liable therefor; (2) such

payments were necessary or advisable to protect any of [the plaintiff's] rights or to avoid or lessen [the plaintiff's] liability or alleged liability' "). This discretion gives rise to the presumption that plaintiff acted in good faith. Defendants have provided no evidence to demonstrate that plaintiff acted fraudulently or in bad faith in paying any of the claims. Defendants have not challenged the propriety or legitimacy of any of the payments made to any of the recipients. In the absence of any evidence submitted by defendants to the contrary, we find no merit to defendants' claims of bad faith on the part of plaintiff. *USF&G*, 190 Ill. App. 3d at 256.

We also note that defendants refer to several letters written in June and July 1999 by Marc Roth, who was investigating the claims lodged by defendants' subcontractors, suppliers, and the municipalities. Defendants overlook the fact that, at the time these letters were written, the parties had, by an agreed order, established a jointly controlled trust account or escrow from which these claims were being paid. If defendants disputed a claim or payment, then they could have objected at that time. No such objection appears in the record. Moreover, defendants' first attorney provided an accounting of the activity of the trust account or escrow and defendants did not challenge that accounting. Our review of the letters and the record reveals no merit to defendants' contention.

■ Next, defendants contend that the trial court abused its discretion in awarding plaintiff the full amount of the attorney fees it sought. Defendants assert that the time entries submitted by plaintiff's attorneys are insufficiently detailed to allow the trial court to determine if the activities, and the time spent on them, were reasonable and necessary to the litigation. Defendants urge that the fees sought by plaintiff be denied in their entirety.

It is well settled in Illinois that a trial court's award of attorney fees is a matter committed to its sound discretion and will not be disturbed absent an abuse of that discretion. *Hanover Insurance*, 182 Ill. App. 3d at 797. The trial court will award only those fees that are reasonable, consisting of reasonable charges for reasonable services. *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 983 (1987). The reasonableness of the fees is based upon:

> " 'the skill and standing of the attorney employed; the nature of the cause and the novelty and difficulty of the questions at issue; the amount and importance of the subject matter; the degree of responsibility in the management of the cause; the time and labor required; the usual and customary charge in the community; and the benefits resulting to the client.' " *Hanover Insurance*, 182 Ill. App. 3d at 797, quoting *Laff v. Chapman Performance Products, Inc.*, 63 Ill. App. 3d 297, 307 (1978).

The trial court reviewed the petition for attorney fees and noted that defendants were not disputing the rate charged for the services. Then the trial court held:

> "I believe that the description of the individual entries of work performed by attorneys, although terse, and concise is adequate. There were some, in fact, underbillings which you were honest enough to point out, Mr. Barber [defendants' attorney], but I believe that for 21 lawsuits or claims that this represented a very reasonable amount of money, so I will award the fees."

Our review of the record convinces us that the trial court did not abuse its discretion in awarding plaintiff all of the fees it sought. We have carefully reviewed the supporting documentation attached to plaintiff's attorney's affidavit and find that it is sufficiently detailed to allow the trial court to assess the reasonableness and necessity of the services rendered. The record shows that plaintiff seeks the recovery of attorney fees stemming from the issuance of numerous performance and payment bonds, which led to 21 lawsuits, and a number of settlements negotiated on several projects. All of this legal action can be traced back to the bonds issued on behalf of defendants. Accordingly, we hold that the trial court did not abuse its discretion in awarding plaintiff all of the attorney fees it sought.

Defendants specifically contend that a number of the entries were too terse to allow the trial court to discern the connection between the service depicted in the entry and the case. We have carefully reviewed the record and find that the supporting documentation lists each attorney, the time spent performing the services, and a description of the services. The descriptions are adequate to inform both the client and the court of what the attorneys were doing. Defendants point to *Kaiser* and claim that the entries here were similarly devoid of intelligible information. We disagree. In *Kaiser*, the attorney presented only a summary and related, by affidavit, that the underlying records had been destroyed. *Kaiser*, 164 Ill. App. 3d at 985-86. As a result, we find that *Kaiser* is distinguishable and does not control our determination of this issue.

We also note that plaintiff urges that we hold, as a matter of law, that it receive all the attorney fees it requested by virtue of the indemnity agreement itself. Plaintiff, citing to *Transamerica Premier Insurance Co. v. Nelson*, 110 Nev. 951, 878 P.2d 314 (1994), argues that to consider the reasonableness of the requested fees and to diminish the award if some of the fees were found to be unreasonable would frustrate the intent of the Agreement. Plaintiff urges that all of the fees should be awarded as a matter of course because the Agreement's intent is to indemnify plaintiff for all expenses incurred, including

legal fees and costs. In light of our resolution of the issue above, however, we need not and do not address this argument.

■ Last, defendants argue that the trial court abused its discretion in refusing them leave to plead over and to raise affirmative defenses. They first assert that they were misled by plaintiff's complaint. Specifically, defendants claim that plaintiff improperly mixed the concepts of exoneration and indemnity in a single count. Defendants argue that they reasonably assumed that plaintiff had to show some violation of an underlying bond in order to claim exoneration or indemnity. Thus, defendants suggest that they were somehow surprised when plaintiff argued that they had defaulted under the Agreement, in addition to claiming that subcontractors and suppliers had made claims under the bonds.

Defendants, however, did not attack plaintiff's complaint in any timely way in the trial court. Indeed, defendants first raised this contention in their motion to reconsider the entry of summary judgment. Further, the motion for summary judgment was raised after this case had actively proceeded for at least two years and defendants were granted opportunities to take any discovery that they thought was necessary. In addition, plaintiff's motion for summary judgment clearly specified the grounds by which it was proceeding, and defendants were even given leave to conduct any additional discovery that they thought was necessary to respond to the motion for summary judgment. Defendants' argument is without merit.

To the extent that defendants claim that the motion for summary judgment exceeded the scope of plaintiff's pleadings, we disagree. We note that plaintiff requested that the Agreement be enforced and sought exoneration and indemnification. Further, plaintiff sought "such other and further relief as this [trial] court deems just and equitable." While plaintiff specified certain bonds in the complaint, the motion for summary judgment added additional bonds and claims arising under them. These, however, fell within the "other and further relief" sought by plaintiff. *Jiffy Lube International, Inc. v. Agarwal*, 277 Ill. App. 3d 722, 726 (1996). Accordingly, we find no merit to defendants' contention.

Further, we note that defendants answered plaintiff's complaint and agreed to the entry of the May 4, 1999, order creating the joint trust account or escrow. Upon the filing of the motion for summary judgment, defendants did not raise confusion or misunderstanding of the relief sought or the basis on which it was sought. Instead, they sought, and were given leave, to conduct discovery to respond to the motion, and they did respond. Only in their motion to reconsider did defendants first contend that plaintiff's complaint was somehow

misleading. Based on these circumstances, defendants cannot complain that they were misled and prejudiced by the form of plaintiff's complaint. See *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 60-61 (1994) (a defendant's failure to attack pleading before the resolution of the case will preclude the defendant from later complaining about defects in the pleading).

The second part of defendants' argument on this issue is that they should have been permitted to replead in order to raise equitable defenses. We note that defendants did not include a copy of the proposed pleading. We also note that this action had been pending for three years at the time defendants sought leave to once again raise affirmative defenses. (Defendants filed affirmative defenses initially, but voluntarily dismissed them when they filed their cross-complaint.) Section 2—616(a) of the Code of Civil Procedure (735 ILCS 5/2—616(a) (2002)) permits a party to amend its pleadings to include an affirmative defense at any time before final judgment. *Horwitz v. Bankers Life & Casualty Co.*, 319 Ill. App. 3d 390, 397 (2001). We review the trial court's decision whether to allow the amendment for an abuse of discretion. *Horwitz*, 319 Ill. App. 3d at 397. Our review of the record convinces us that the trial court did not abuse its discretion in denying defendants leave to amend their answer to add affirmative defenses.

Moreover, defendants assert that they would raise the defenses of unclean hands and equitable estoppel. Defendants offer no facts or argument to show a factual basis suggesting any deceit or unfair means by which plaintiff asserted its rights under the Agreement. Likewise, defendants offer no facts or argument to show a factual basis by which plaintiff should have been estopped from asserting its rights under the Agreement. Specifically, it is undisputed that plaintiff demanded a collateral deposit and defendants failed to make such a deposit. Additionally, it is undisputed that claims were made under the bonds. Plaintiff did not prevent payments from being made to subcontractors and suppliers and the record shows that defendants in fact agreed to various payments made to subcontractors and suppliers. As defendants have not demonstrated any factual basis sufficient to support the defenses they attempt to assert, we discern no abuse of discretion in the trial court's decision to refuse to allow defendants the opportunity to replead and raise affirmative defenses following the entry of summary judgment.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

GROMETER and CALLUM, JJ., concur.