In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 08-3403 & 09-2071

REXAM BEVERAGE CAN COMPANY,

*Plaintiff-Appellant,*

*v.*

DAVID F. BOLGER, as Trustee of the
David F. Bolger Revocable Trust, and
CITY OF FAYETTE, IOWA,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 2234—**Martin C. Ashman**, *Magistrate Judge.*

ARGUED OCTOBER 8, 2009—DECIDED AUGUST 24, 2010

Before EASTERBROOK, *Chief Judge,* and MANION and
TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This commercial landlord-tenant
dispute involves a tenant who overstayed its welcome
at a warehouse with a leaky roof, the replacement of
which both landlord and tenant deny is their responsi-
bility. After the tenant filed an action for declaratory

judgment against the landlord, the landlord counter-claimed on several Illinois state law grounds. The district court, sitting in diversity, ruled in the landlord's favor and found the tenant liable for over $1.5 million in damages, including roughly $400,000 for the replacement of the roof. The district court also awarded the landlord over $800,000 in attorneys' fees and costs. The tenant appeals. We affirm in part, vacate in part, and remand for proceedings consistent with this opinion.

## I.  Background

### A.  Factual

In 1966, plaintiff-appellant Rexam's predecessor in interest and defendants-appellees' predecessor in interest entered into a complex tax-advantaged transaction under which Bolger's[1] predecessor financed and constructed a warehouse in Loves Park, Illinois, and leased it to Rexam and its predecessors for an extended period of time. (Loves Park is near Rockford; Rexam refers to the warehouse as the "Rockford Warehouse.") Rexam occupied the warehouse for nearly forty years without incident, and in late 2005 attempted to extend its tenure there for another five years. But the lease contained a provision requiring 180-days' renewal notice, and Rexam delayed in notifying Bolger of its intent to renew the

---

[1] We refer to the defendants collectively as "Bolger" and use the pronoun "he" both for ease of reading and because David Bolger was the primary actor on behalf of all defendants.

lease until only about 90 days remained in the current lease term. Bolger informed Rexam in writing that the lease would expire at the end of the term, on March 31, 2006, and that Rexam would need to cede possession to him at that time. He also indicated that some repairs would need to be made to the property before Rexam vacated the warehouse.

Two weeks before Rexam was supposed to vacate, it filed a declaratory judgment action, seeking a ruling that Bolger had waived any objection to its late renewal notice. (This appeal stems in part from counterclaims related to that action.) While the action was pending before the district court, and even after it was eventually resolved in Bolger's favor in July 2007, Rexam remained in possession of the warehouse. In May 2006, Bolger notified Rexam that he intended to seek double the market rental value of the warehouse for each month that Rexam overstayed the lease. *See* 735 Ill. Comp. Stat. 5/9-202 ("Holdover Statute"). Apparently undeterred, Rexam demanded that Bolger honor its lease renewal request, continued to remit rent payments to Bolger, and paid the utilities each month. Bolger did not acknowledge the utility payments, which Rexam made directly to the providers, and he returned all the rent checks uncashed. Rexam nonetheless continued its occupation of the warehouse.

Rexam searched for a suitable replacement warehouse throughout 2006. It ultimately negotiated a lease for what it maintains was a "superior" facility in September 2006. It agreed to rent that property for a gross rate

of $2.60 per square foot. (A gross rental rate has insurance, taxes, and utilities built in. "Net" or "triple net" rates reflect only the cost of the property itself; tenants typically pay the insurance, taxes, and utilities separately under so-called net leases.) Bolger's expert, whose testimony the district court credited over that of Rexam's lay witness, valued the Loves Park warehouse at a gross rate of $4.38 per square foot.

Sometime in mid-April 2007, Rexam moved into its new premises and informed Bolger that he could take possession of the warehouse after Rexam finished some repairs it believed were required under the lease. Between April and August 2007, Rexam undertook $265,000 worth of repairs to the Loves Park property. It completed the repairs on August 30, 2007, and ceded possession to Bolger on August 31, 2007, seventeen months after the lease had expired.

Bolger claims that several features of the warehouse were in disrepair when he retook possession. The roof is the main one at issue here. Bolger had the roof inspected on November 28, 2007, and the inspector determined that the roof flashings and insulation had been exposed to the weather and noted that the roof felt spongy when he walked on it. The inspector concluded that the roof would need to be removed and replaced, a project he estimated would cost $405,470.

Bolger made no attempt to repair or replace the roof. Instead, on January 16, 2008, he sold the property as-is for $1,825,000. (The buyer subsequently replaced the roof at its own expense.) Bolger claims this sale price

reflected a significant discount for the poor condition of the roof, and asserts that the condition of the roof adversely affected his negotiations with potential buyers.

## B. Procedural

This action is before us as a result of Rexam's March 14, 2006, attempt to procure a declaratory judgment that Bolger waived objections to its lease renewal. Rexam, a citizen of Delaware and Illinois for diversity purposes, filed its action in Illinois state court, but Bolger, who has Florida and Iowa citizenship, removed the action to the Northern District of Illinois on diversity grounds. *See* 28 U.S.C. §§ 1332, 1441. Bolger also filed Illinois state law counterclaims for forcible entry and detainer, wrongful possession, and breach of contract, and sought reimbursement of double rent under the Holdover Statute. On July 24, 2007, the district court determined that Rexam's notice of renewal was untimely and that its holdover tenancy was "willful" for the purposes of the Holdover Statute.

After Rexam vacated the property at the end of August 2007, Bolger amended his counterclaims and moved to set a termination date for Rexam's willful holdover tenancy. The court treated his motion as one for partial summary judgment, and on January 18, 2008, concluded that Rexam tendered possession of the property and ended its holdover tenancy on August 31, 2007. Even after this ruling and another ruling later that month, several elements of Bolger's counterclaims re-

mained unresolved, including the fair market rental value of the warehouse and Rexam's liability, if any, for damage to the property and other alleged violations of the lease.

The case proceeded to a five-day bench trial, after which the district court entered final judgment for Bolger. The court determined that Rexam was liable for $1,156,232.24 in damages as a result of its holdover tenancy and the Holdover Statute; this amount was calculated using the gross rental rate of $4.38 per square foot and reflected a $101,471.59 setoff for Rexam's payment of utilities while it held over. The court also ordered Rexam to pay $405,470 to cover the replacement cost of the roof, and $20,306 to replace some broken dock levelers.

The district court later awarded Bolger $744,726.87 in attorneys' fees, $70,000 in supplemental attorneys' fees (to cover the expenses associated with his motion for attorneys' fees) and $5338.42 in taxable costs. All told, Rexam is on the hook for over $2.4 million: $1,582,008.24 in damages and $820,065.29 in attorneys' fees and costs. In this consolidated proceeding, Rexam disputes several aspects of the district court's three final judgments, including its liability for the roof and Bolger's proof of damages thereto, the application of the Holdover Statute and the calculation of Bolger's damages thereunder, and the award and amount of Bolger's attorneys' fees. We consider these issues in turn.

## II. Discussion

## A. The Roof

### 1. Liability

Rexam first challenges the district court's conclusion that its lease with Bolger required it to replace the roof. Rexam argues here, as it did at trial, that it was only responsible for general maintenance and upkeep of the property and not for major repairs of the warehouse's structural components. It argues that the district court misconstrued the language of the lease and erroneously concluded that responsibilities not directly assigned to the landlord automatically fell to the lessee. Rexam also asserts that the district court incorrectly read pertinent clauses of the lease in isolation rather than as part and parcel of the document as a whole. Bolger counters that Rexam's obligation to replace the roof was "plainly discoverable in the lease," that the parties intended for Rexam to bear the cost of such structural changes, and that the "ordinary wear and tear" clause does not absolve Rexam of its responsibility to replace the roof. The district court's interpretation of contract language is a question of law that we review de novo. *See Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 594 (7th Cir. 2009). We review its interpretation of state law the same way. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 239 (1991); *Estate of Moreland v. Dieter*, 576 F.3d 691, 695 (7th Cir. 2009).

Under Illinois law, which the lease by its terms renders controlling and which is applicable in this diver-

sity action, *see Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938), leases are treated no differently than other written contracts, *Williams v. Nagel*, 643 N.E.2d 816, 822 (Ill. 1994), so we begin with an analysis of the terms of the lease, *see Kallman v. Radioshack Corp.*, 315 F.3d 731, 735 (7th Cir. 2002) (applying Illinois law). Though the parties' dispute centers on a single paragraph of a twenty-four page lease, we must ultimately construe the provision as part of the whole lease, viewing it in light of the others; we cannot ascertain the intent of the parties from a single provision in isolation. *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). However, if the language is unambiguous, that is, not susceptible to more than one meaning, we confine our analysis to the language of the lease, *see id.*, and we read that language according to its ordinary meaning, *Kallman*, 315 F.3d at 736 (applying Illinois law). With these principles in mind, we look first to the provision at issue.

Article 5(c) of the lease states, in its entirety:

> Maintenance and Alteration. Lessor shall have no obligation with respect to the maintenance and repair of the Premises or any buildings or improvements which may be erected or made thereon. Lessee shall be solely responsible for the maintenance of such buildings and Premises and for keeping all of the same in good condition, order and repair, including all structural and extraordinary changes that may be required, reasonable use and ordinary wear and tear excepted, and Lessee will repair, during the term, all

> injury or damage done by the installation or re-
> moval of equipment or property. Lessee may
> make structural and other alterations or additions
> to the Premises and to any buildings or improve-
> ments which may be erected or made thereon,
> provided the general character thereof is not
> materially changed and the value of the Premises
> as a whole is not reduced thereby.

Rexam argues that Article 5(c) obligates it to maintain the continuing operational state of the warehouse but not to replace substantial portions of the premises that wear out notwithstanding ordinary maintenance. It further contends that Article 5(c), when read as a whole and in conjunction with Article 11(a) ("Future Improvements"), "contemplate[s] that if in the future there is a structural or extraordinary change to the building, Rexam is responsible for the maintenance of that to the same extent as the rest of the Rockford Warehouse, 'reasonable use and ordinary wear and tear excepted.'" Appellant's Br. 23.

We do not read Article 5(c) like Rexam does. According to its plain, albeit structurally convoluted language, Article 5(c) places upon Rexam the responsibility for keeping the entirety of the premises and its structures "in good condition, order and repair, *including* all structural and extraordinary changes that may be required." As the rules of normal English grammar dictate, we read the phrase "including all structural and extraordinary changes that may be required" to modify the phrase preceding it, not, as Rexam would have it,

modified *by* the "ordinary wear and tear excepted" language following it. Similarly, we read the "ordinary wear and tear excepted" language to modify the introductory clause of the sentence, "Lessee shall be solely responsible for the maintenance of such buildings and Premises and for keeping all of the same in good condition, order and repair." Pursuant to the plain terms of Article 5(c), read in accordance with common grammar rules, Rexam was responsible for keeping the premises in good—not perfect—repair, and was responsible for any necessary structural changes as well. The first sentence of Article 5(c), which expressly exempts Bolger from any obligation to repair or maintain anything on the premises, further supports this conclusion.

Article 5(c) is more than a mere "general covenant to repair," which would bind Rexam only "to make the ordinary repairs reasonably required to keep the premises in proper condition; it [would] not require [Rexam] to make repairs involving structural changes." *Kaufman v. Shoe Corp. of Am.*, 164 N.E.2d 617, 620 (Ill. 1960). This is because the language of Article 5(c) renders Rexam's responsibility for structural changes, such as the replacement of the roof, "plainly discoverable." *Id.* Although the term "roof" does not appear explicitly within Article 5(c), *see Sandelman v. Buckeye Realty, Inc.*, 576 N.E.2d 1038, 1040 (Ill. App. Ct. 1991), the unambiguous phrases "including all structural and extraordinary changes that may be required" and "Lessor shall have no obligation with respect to the maintenance and repair of the Premises," do, *see Kallman*, 315 F.3d at 737-38. Phrases such as these are conspicuously absent from

the leases in *Quincy Mall, Inc. v. Kerasotes Showplace Theatres, LLC*, 903 N.E.2d 887, 891 (Ill. App. Ct. 2009), and *Sandelman*, 576 N.E.2d at 1039-40, both of which were found to lack "plainly discoverable" language shifting the burden of roof replacement to the tenant.

Placing Article 5(c) in the context of the lease as a whole strengthens our interpretation of it. The phrase "including all structural and extraordinary changes that may be required" is not an anomaly localized solely within Article 5(c). Virtually identical language appears in Article 5(a) of the lease, which requires Rexam to comply at its own expense with all "laws, ordinances, rules, regulations, and requirements . . . including the making of all structural and extraordinary changes that may be required." Even looking beyond Article 5 to Article 11(a), as Rexam suggests, does not alter our construction of the terms in Article 5(c). Article 11(a), which contemplates the "erection and financing" of new structures—not the replacement of components of existing structures—in no way requires that Article 5(c) be read as a mere general covenant to repair. Article 11(a) permits Rexam to construct, at Bolger's expense, new "improvements" to vacant areas of the premises, and provides that after any such buildings are constructed, that Bolger and Rexam would be required to "negotiate in good faith regarding the erection and financing of such improvements." It says nothing about fixing or replacing existing improvements, nor does it mention or reference "repair" or "ordinary wear and tear."

The fact that replacing the roof of a commercial building is a large and costly project is of no moment. In Illinois, "[i]t is well established that where a lease contains a clause making the lessee generally responsible for repairs, the expense of repairing subsequently discovered deficiencies falls upon the lessee, unless the deficiency is so substantial and unforeseen as to be termed 'structural.'" *Koenigshofer v. Shumate*, 216 N.E.2d 195, 196 (Ill. 1966). Thus even under a more limited general covenant to repair, a lessee could be responsible for substantial yet foreseeable repairs. The Illinois Supreme Court determined that the replacement of a building's heating system due to a utility's discontinuation of steam heat was "structural" in the unforeseeable sense, *Kaufman*, 164 N.E.2d at 620, and opined in dictum that the collapse of a building resulting from a latent defect would be similarly "structural," *Koenigshofer*, 216 N.E.2d at 196. But the problems with the roof here were not "structural" in the unforeseeable sense; the commercial lease at issue here had the potential to last nearly fifty years, and Rexam could not close its eyes to the near certainty that the roof would not equal the lease in staying power. *Cf. Sandelman*, 576 N.E.2d at 1040 (concluding that it would be "unfair" to require lessee to replace a roof where "he could not have foreseen" the need to do so when the lease term began).

Rexam finally argues that we should construe the lease against Bolger, a "sophisticated businessman" and lessor who drafted the lease. *See Sears, Roebuck, & Co. v. Charwil Assocs. Ltd. P'ship*, 864 N.E.2d 869, 874 (Ill. App. Ct. 2007). This argument is unsuccessful because we only

apply rules of construction when a genuine ambiguity exists in the language, not merely when the parties disagree as to how the language should be interpreted. *See Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (applying Illinois law). Moreover, Rexam is not unsophisticated; nor was its predecessor in interest that signed the lease.

For the foregoing reasons, we affirm the district court's conclusion that Rexam was contractually bound to replace the roof of the Loves Park warehouse.

## 2. Damages

The district court awarded Bolger $405,470 in damages for Rexam's failure to replace the roof. This amount was the estimated cost of replacing the roof, which the district court concluded was equivalent to any diminution in the fair market value of the property. Rexam argues that the district court erred in determining the award, because in its view Bolger offered no evidence of loss or diminution in the market value of the property resulting from the faulty roof. The amount of recoverable damages is a question of fact, while the measure of damages upon which the factual computation is based is a question of law. We therefore review the district court's damage-computation methodology de novo, but review the amount of the award only for clear error. *See Whittington v. Indianapolis Motor Speedway Found.*, 601 F.3d 728, 732 (7th Cir. 2010); *see also Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1183 (10th Cir. 2009) ("While we review the amount of a damage award for clear error, the methodology a district court uses in

calculating a damage award, such as determining the proper elements of the award or the proper scope of recovery, is a question of law we review de novo." (quotation omitted)).

When assessing damages for injury to real property under Illinois law, the first question is whether the injury is permanent or temporary. *LaSalle Nat'l Bank v. Willis*, 880 N.E.2d 1075, 1093 (Ill. App. Ct. 2007); *Meade v. Kubinski*, 661 N.E.2d 1178, 1184 (Ill. App. Ct. 1996). Put another way, the question is whether the property is damaged in such a way as to render repair impracticable. Here, the district court concluded that the warehouse was damaged, but could be restored to good condition with a replacement roof. This conclusion was supported by evidence introduced at trial; Rexam does not dispute it and we do not disturb it. Instead, we move forward to the next inquiry required in Illinois: whether the expense of restoration exceeded the drop in the market value of the property. *See Meade*, 661 N.E.2d at 1184; *Ceres Terminals, Inc. v. Chi. City Bank & Trust Co.*, 635 N.E.2d 485, 501-03 (Ill. App. Ct. 1994). If the cost to repair exceeds the drop in market value attributable to the lack of repair, the measure of the award should be the diminution in market value, so as to avoid windfalls (to landlords) and injustice (to tenants). *Meade*, 661 N.E.2d at 1184-85 (collecting cases); *Ceres Terminals*, 635 N.E.2d at 501-02 (quoting *Bowes v. Saks & Co.*, 397 F.2d 113, 116-17 (7th Cir. 1968)).

Contrary to Rexam's assertions that Bolger offered no evidence on the matter, the record shows that the

district court was presented with conflicting evidence regarding the roof's impact on the value of the property as well as the cost to replace the roof. The real estate broker who sold the warehouse testified that he adjusted his estimated market price for the property downward by about $345,000 to reflect its disrepair. He noted that he took into account other items also in disrepair when doing so, such as the rail spur and landscaping, but maintained that the problems with the roof were the most significant factor underlying the adjustment. Other evidence showed the ultimate sales price for the property was $230,000 below the listing price. Bolger's roofing expert testified that it would cost about $405,470 to replace the roof. The court considered these divergent figures and ultimately concluded that the decrease in the property's market value was neither greater than nor less than but instead was equivalent to the cost of repairing the roof:

> [I]t is possible, in fact likely, that Bolger had to reduce its asking price in light of the seriously damaged condition of the property. Therefore, the asking price cannot be used as a starting point for measuring the decreased value of the property. It is also reasonable to infer that any purchaser would discount its offer in light of the anticipated costs of repairing the damage Bolger seeks to recover for here, particularly the roof, which is a necessity under any conceivable use of the facility. Therefore, it cannot be said that the cost to repair exceeds the decrease in market

> value of the facility; rather, the estimated cost of repair is the only reasonable proxy the Court has for determining the decreased market value of the property in its damaged condition. In other words, the property was diminished in value by the amount needed to repair it, whether or not it was actually repaired by Bolger.

*Rexam Beverage Can Co. v. Bolger*, No. 06 C 2234, 2008 WL 4087441, at *12 (N.D. Ill. Aug. 20, 2005). In other words, it "assum[ed] that the purchaser reduced the purchase price by the amount it would have to expend to rehabilitate the premises." *349 W. Ontario Bldg. Corp. v. Palmer Truck Leasing Co.*, 317 N.E.2d 740, 748 (Ill. App. Ct. 1974). This strikes us as a reasonable rather than clearly erroneous conclusion to reach.

The general rule in Illinois is that damages due to a breach of contract are limited to actual losses arising from the breach. *Id.*; *see also Ceres Terminals*, 635 N.E.2d at 501 ("The goal is to restore the party to the equivalent of his pre-injury position." (quotation omitted)). By finding that the cost of replacing the roof was the same as the reduction in the property's value stemming from its poor condition, the district court linked Bolger's damages award to the actual loss he suffered from Rexam's breach. *Cf. Ceres Terminals*, 635 N.E.2d at 503 (refusing to award damages for injury to a wooden warehouse where the trial court expressly found that the injury had no effect on the property's fair market value). Rexam's assertion to the contrary is unavailing.

The district court appropriately applied Illinois law, and the damages award it calculated does not leave us with "the definite and firm conviction that a mistake has been committed." *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008) (quotation omitted). We therefore affirm the $405,470 award to Bolger.

## B. The Holdover Statute

### 1. Applicability

Since 1827, Illinois has had on its books a statute that permits landlords to recover double the fair market rental value of their properties from tenants who willfully hold over on leases. *See* 735 Ill. Comp. Stat. 5/9-202. The statute is intended to protect and compensate landlords. *See Granger v. Bd. of Trs. of Ill. & Mich. Canal*, 18 Ill. 443 (1857). Because of its penal nature, it is only applied when tenants know their retention of possession is wrongful; that is, when they lack a colorable justification for remaining in possession. *J.M. Beals Enters., Inc. v. Indus. Hard Chrome, Ltd.*, 648 N.E.2d 249, 252 (Ill. App. Ct. 1995).

Here, the district court determined that Rexam's entire post-lease stay of seventeen months was both willful and wrongful and awarded Bolger over $1 million pursuant to the Holdover Statute. We review de novo the district court's determination of the legal standard for recovery under Illinois law, but because the determination of whether a holding over was willful is a

question of fact we review it only for clear error. Findings of fact are clearly erroneous "only when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Econ. Folding Box Corp.*, 515 F.3d at 720 (quotation omitted).

Rexam first asserts that the Holdover Statute should not apply because Bolger failed to conform with its requirements. Though Rexam is correct that landlords must strictly comply with the Holdover Statute's terms to recover, *Stride v. 120 W. Madison Bldg. Corp.*, 477 N.E.2d 1318, 1321 (Ill. App. Ct. 1985), that argument lacks traction here. The Holdover Statute by its terms asks very little of landlords who seek to invoke it; it requires only that they demand possession of the property in writing. 735 Ill. Comp. Stat. 5/9-202. Rexam acknowledges in its opening brief that Bolger did just that: "By letter dated February 27, 2006, Bolger . . . rejected Rexam's renewal notice. Bolger instructed Rexam to surrender the Rockford Warehouse by the end of the term, March 31, 2006." Appellant's Br. 6. Bolger also took the additional step of notifying Rexam in writing of his intent to pursue damages under the Holdover Statute on May 5, 2006, just over a month into Rexam's holdover tenancy. Illinois courts have long denied the benefits of the Holdover Statute to landlords who terminate their tenants' leases, *see Stuart v. Hamilton*, 66 Ill. 253 (1872), but Rexam does not allege (and the record does not support the conclusion) that Bolger affirmatively terminated the lease here.

Rexam also makes much of the fact that Bolger demanded that it make some repairs to the property. On

February 16, 2006, and again on February 27, 2006, Bolger indicated in writing that he expected Rexam to address a few exterior problems with the warehouse, specifically some broken windows, a concrete block wall, and debris and overgrowth on the warehouse's railroad spur. Rexam asserts that Bolger, via these communications, forced it into a "Hobson's choice" by demanding repairs to the property while simultaneously requiring Rexam to vacate in a timely fashion. *See J.M. Beals,* 648 N.E.2d at 253. We fail to see the bind here. Rexam could have chosen to vacate on time, leaving some repairs undone, or it could have sought Bolger's permission to stay on and complete the requested repairs. It did neither. Rexam was not forced into a Hobson's choice; Rexam simply made no choice. Bolger, on the other hand, chose to give Rexam advance warning of the repairs he wanted done before the end of the lease (six weeks' advance notice, double the three weeks' notice provided in *J.M. Beals*) and then chose, again with ample notice to Rexam, to pursue damages under the Holdover Statute. In trying to avoid the writing on the wall, Rexam painted itself into the corner in which it now stands. Its Hobson's choice argument thus lacks merit.

Rexam's final argument against the application of the Holdover Statute is that the district court applied the incorrect standard when it concluded that Rexam's behavior was "willful." The Holdover Statute does not define "willful," *see* 735 Ill. Comp. Stat. 5/9-202, and Rexam asserts that the term is best interpreted as requiring bad faith on the part of the tenant, *see Stride,* 477 N.E.2d

at 1321 ("Consistent with its finding that Stride's hold over was not in bad faith, the trial court properly denied double rent . . . ."). But the Illinois Appellate Court more recently—and explicitly—reached a different conclusion, one to which the district court properly deferred. In *J.M. Beals,* 648 N.E.2d at 252, the Illinois Appellate Court expressly declined to make "such a broad pronouncement that bad faith is required for all claims brought under the statute." It determined that the "better rule," the one the district court faithfully looked to here, was that tenants who remain in possession for "colorably justifiable reasons . . . should not be charged under the statute." *Id.* The *J.M Beals* court further clarified that "the tenant, to be liable under the statute, must know that his retention of possession is 'wrongful.'" *Id.* (quoting *Stuart*, 66 Ill. at 255).

The district court cogently explicated the evidence and reasoning underlying its conclusion that Rexam "made a conscious decision to overstay the lease because it thought the penalty would not be severe." *Rexam*, 2008 WL 4087441, at *3. It pointed to Rexam's testimony that it was staying to "possibly to try to get new lease terms in the building," and its admission in its briefs that its decision to overstay the lease was the result of a "calculus." *Id.* In light of this evidence, we are not persuaded that the district court erred in determining that Rexam acted willfully in staying on the premises. We are similarly unconvinced that Rexam's attempt to eke out a new lease is the sort of "colorably justifiable" reason for barring application of the Holdover Statute that the appellate court contemplated in *J.M. Beals.* And

because Rexam was notified in writing that its lease had expired, and was continually reminded of that fact by Bolger's sedulous refusal of its rent payments, we find no clear error in the district court's conclusion that Rexam knew its retention of possession was wrongful.

## 2. Damages

The Holdover Statute, which the district court correctly deemed applicable here, provides that a tenant must pay a penalty of "double the yearly value of the lands" to a landlord kept out of possession due to the tenant's willful holdover. 735 Ill. Comp. Stat. 5/9-202. To calculate Rexam's penalty, the district court first had to determine the fair market rental value of the "lands" at issue here. Both parties offered testimony for the court's consideration. Brian Clancy, Rexam's real estate consultant, testified that Rexam investigated five nearby properties when it was looking for replacement space. Clancy stated that the gross rents for those facilities ranged in price from $1.75 to $3.00 per square foot, while the triple net rental rates ranged from $1.75 to $2.25 a square foot. He testified that the warehouse on the property Rexam selected was a "better building" than the Loves Park warehouse and came at a gross rental rate of only $2.60 per square foot. Clancy estimated that if the lease had been triple net, the rent would have been about $1.25 lower per square foot. He did not directly testify as to the value of the Loves Park property; instead, Rexam contends that the triple net rental rate should have been about $1.35 per square

foot—calculated by subtracting the $1.25 gross rate differential from the $2.60 per square foot rate it secured on its new facility.

The district court rejected Clancy's lay testimony and relied instead on that of Bolger's expert, Christopher Hall, the president of the appraisal division of an international real estate company. Hall conducted a formal appraisal of the Loves Park property, which involved an in-person inspection of the property, an evaluation of the Loves Park-Rockford commercial real estate market, and an assessment of four comparable properties in the area. To arrive at his estimates of the fair market rental value of the Loves Park property, Hall analyzed the features of the comparable properties and figured out the contribution each made to the properties' value. For instance, he examined the ceiling heights in all the comparable buildings, determined the impact that attribute had on their values, and used that information to adjust his computation of the Loves Park rental rate accordingly. Hall testified that the fair market rental value of the Loves Park property was $2.43 per square foot net, a number that took into account its deteriorated condition. He further testified that he used that figure and historical expense information to compute a gross rental rate of $4.38 per square foot.

The district court used Hall's valuation of the gross rental rate to conclude that the annualized gross rental value of the roughly 101,000-square-foot warehouse was $443,895.47. Dividing that figure by twelve yields a monthly gross rental rate of $36,991.29. The district court

multiplied the monthly rate by seventeen, the number of months it already found that Rexam had willfully held over, and doubled the result to arrive at the Hold-over Statute penalty, $1,257,703.83. The district court subtracted from this amount the $101,471.59 that Rexam paid in utilities during the holdover period because it used a gross rental rate (which includes taxes, utilities, and insurance), and assessed Rexam a penalty of $1,156,232.24.

Rexam takes issue with the district court's calculation. It first asserts that the district court erroneously concluded that expert testimony was required for it to determine the fair market value of the warehouse. It rests this contention on a single sentence of the district court's opinion: "The issue of comparability—of the facilities, of locations, of time, and of lease terms—is one that requires the type of expert testimony that Rexam declined to provide in this case." *Rexam*, 2008 WL 4087441, at *5.

This argument fails for two reasons. The first is that Rexam reads too much into the single sentence to which it points. The overall tenor of the district court's discussion of market value indicates that what it was really doing was making a credibility determination: it found Bolger's expert more credible than Clancy, Rexam's lay witness. It noted that Rexam's valuation "lacks a convincing foundation in fact," and found its numbers "unpersuasive." *Id.* Contrary to Rexam's assertions that its non-expert testimony was inappropriately deemed inadmissible, the trial transcripts reveal that the district court allowed Clancy to testify as a lay witness (Rexam

never sought to have him classified as an expert even though it now touts his qualifications), and the district court's opinion indicates that it thoroughly considered his testimony in making its determination of the property's value. It is well established that we "will set aside credibility determinations only if they are clearly erroneous, which occurs only if the district court has chosen to credit exceedingly improbable testimony." *United States v. Smith*, 576 F.3d 681, 687 (7th Cir. 2009) (quotations and citations omitted). Here, the district court credited Hall's testimony over Clancy's, and because Hall's testimony about his comparability analysis and the value of the Loves Park warehouse was not "exceedingly improbable," *see id.* ("[T]estimony will be found exceedingly improbable only if it is internally inconsistent or implausible on its face." (quotations and citation omitted)), we uphold the district court's determination.

Rexam's argument falls flat even if we read the district court's statement about expert testimony as it does. "Whether the jury"—or, in this case, the court in its role as factfinder—"needs expert testimony for a particular claim is a question within the district court's discretion." *Talmage v. Harris*, 486 F.3d 968, 977 (7th Cir. 2007); *cf. United States v. Jones*, 455 F.3d 800, 805 (7th Cir. 2006) ("Mr. Jones also contends that expert testimony would have aided the jury . . . . Nevertheless, the district court was entitled to conclude that such testimony would have been of limited value in the overall presentation of his case."). "Under the Federal Rules of Evidence, expert testimony is appropriate if specialized knowledge will assist the trier of fact to understand the evidence or to

determine a fact in issue." *United States v. Myers*, 569 F.3d 794, 798 (7th Cir. 2009) (internal quotations omitted). Even under Rexam's reading of the opinion, the district court merely concluded that expert testimony would help it determine the appropriate rental value for a commercial property that had not been on the market in forty years. *Cf. Ceres Terminals*, 635 N.E.2d at 496 ("[A] general estimation of the property's valuation considers numerous intangible factors which could be weighed and combined in a wide variety of ways . . . ."). We do not view this as an abuse of the district court's discretion or a contravention of the Federal Rules of Evidence.

Rexam next argues that the district court erred in using a gross rental value rather than a net one as the basis for its penalty calculation. A gross rental rate has utilities, taxes, and insurance payments built in; a net rental rate does not. Consequently, the difference between the two can be significant even at the square foot level and is magnified when the rent is doubled under the Holdover Statute. We review the district court's interpretation of the Illinois statute de novo. *Salve Regina*, 499 U.S. at 239; *Estate of Moreland*, 576 F.3d at 695.

The proper way to calculate damages under the Holdover Statute has not been determined by the Illinois courts, as far as we can tell. The parties did not provide any authority on the matter, nor were we able to locate any. Fortunately, the Illinois Supreme Court has been very clear about how statutory interpretation should be undertaken, and, as we must apply the law as we believe that court would, we employ its rules of inter-

pretation as we conduct our de novo interpretation of the Holdover Statute.

In Illinois, "[t]he primary objective in statutory interpretation is to give effect to the intent of the legislature." *Gardner v. Mullins*, 917 N.E.2d 443, 448 (Ill. 2009). Because the most reliable indicator of the legislature's intent is the language of the statute, the Illinois Supreme Court looks there first, applying the "plain, ordinary, and popularly understood meaning[s]" of the statute's terms. *Id.* The Court looks to the dictionary when necessary to discern the ordinary and popular meanings of words. *Exelon Corp. v. Dep't of Revenue*, 917 N.E.2d 899, 906 (Ill. 2009); *People v. Cardamone*, 905 N.E.2d 806, 811-12 (Ill. 2009). In addition to the language of the statute, the Court also considers "the purpose behind the law and the evils sought to be remedied, as well as the consequences that would result from construing the law one way or the other." *County of DuPage v. Ill. Labor Relations Bd.*, 900 N.E.2d 1095, 1101 (Ill. 2008). It assumes that the legislature did not intend "absurdity, inconvenience or injustice," *People v. Glisson*, 782 N.E.2d 251, 255 (Ill. 2002), and looks to legislative history if the need arises, *see County of DuPage*, 900 N.E.2d at 1101.

The critical portion of the Holdover Statute provides: "[T]he person so holding over shall, for the time the landlord or rightful owner is so kept out of possession, pay to the person so kept out of possession, . . . at the rate of *double the yearly value of the lands* . . . ." 735 Ill. Comp. Stat. 5/9-202 (emphasis added). On its face, the italicized language seems to refer to the lands and the

lands alone; the Holdover Statute by its terms awards landlords double the yearly value of the lands, not the value of the lands plus utilities, insurance, and taxes. Indeed, from an economic standpoint, taxes and other expenses are perceived as detractions from the value of a parcel of land.

This interpretation is consonant with the dictionary definition of "annual value": "[t]he net yearly income derivable from a given piece of property," or "[o]ne year's rental value of property, less the costs and expenses of maintaining the property." Black's Law Dictionary 1690-91 (9th ed. 2009). In a gross rent situation, a landlord needs to use some of the rent payments (or other funds under his control) to cover utilities, insurance, taxes, and other "costs and expenses of maintaining the property." Thus, the "net yearly income" he actually receives from the property is more akin, if not equivalent, to the net rental value of the property rather than the gross rental value. Our plain reading of the language is also in accordance with the definition of "land," which includes with the property itself only "everything growing on or permanently affixed to it," *id.* at 955, and does not reach expenses associated with it.

We also look to the purposes and aims underlying the Holdover Statute. *See County of DuPage*, 900 N.E.2d at 1101. In 1857, the Illinois Supreme Court noted that it was enacted "for protection of, and compensation to, landlords who are kept out of their possession." *Granger*, 18 Ill. 443. Those are not its only purposes, however; it has also been consistently recognized as "penal," *see*

*Chapman v. Wright*, 20 Ill. 120 (1858) ("This action is, in its nature, highly penal . . . ."); *J.M. Beals*, 648 N.E.2d at 253 ("An action to recover double rent under the statute is highly penal . . . ."), which of course means that it is intended to punish or penalize, *see* Black's Law Dictionary 1246 (9th ed. 2009).

At first blush, all three purposes—landlord protection and compensation and tenant punishment—would seem best served by a determination that "double the yearly value of the lands" may be calculated using gross rent. After all, the landlord would be more highly compensated and the tenant would be more severely punished (and more deterred from overstaying its welcome). Yet reading the language this way adds an element of injustice, *see Glisson*, 782 N.E.2d at 255, and unduly minimizes the consequences that could result, *see County of DuPage*, 900 N.E.2d at 1101. A landlord could receive windfalls above and beyond her due "compensation," particularly where, as here, the lease that has been held over is by its terms a net lease, and a tenant could be overly deterred from holding over even in situations in which doing so is "bona fide" or "colorably justifiable." *J.M. Beals*, 648 N.E.2d at 252. When the damages are calculated using net rent, the Holdover Statute's purposes are served in a more efficient manner.

In light of the plain language of the Holdover Statute and our examination of the purposes underlying it, we conclude that the intent of the legislature would be better effected if damages were calculated using net

rather than gross rent. Simply reversing the district court on this issue would leave us at an impasse, however. The district court heard conflicting testimony as to the fair market net rental value of the Loves Park warehouse, but the only finding it made was that the *gross* rental value was $4.38 per square foot. Bolger conceded at oral argument that doubling the amount of Rexam's setoff for utilities paid during its holdover—to roughly $203,000— would be appropriate if we upheld the district court's usage of the gross rental rate. But because we have determined that the net rental rate is the proper one to use, this remedy is inadequate: if the district court were to credit Hall's testimony regarding the net value of the property, Rexam's penalty would drop by nearly $400,000, and it might drop further (or less) if the district court were to credit Clancy's testimony or some other estimation of value.

We therefore vacate Bolger's award of $1,257,703.83 and Rexam's setoff of $101,471.59 and remand this issue to the district court so that the fair net rental value of the property can be determined and the correct penalty assessed Rexam.

### C.  The Attorneys' Fees

Illinois follows the "American Rule" of litigation, under which successful parties are generally responsible for their own attorneys' fees unless a statute or contract provides otherwise. *In re Weinschneider*, 395 F.3d 401, 404 (7th Cir. 2005); *Taylor v. Pekin Ins. Co.*, 899 N.E.2d 251, 256 (Ill. 2008). Its courts strictly construe contractual

provisions permitting the award of attorneys' fees, but the decision to award costs and fees pursuant to such provisions lies within trial courts' sound discretion. *Pa. Truck Lines, Inc. v. Solar Equity Corp.*, 882 F.2d 221, 227 (7th Cir. 1989); *Mountbatten Sur. Co. v. Szabo Contracting, Inc.*, 812 N.E.2d 90, 104 (Ill. App. Ct. 2004); *Powers v. Rockford Stop-N-Go, Inc.*, 761 N.E.2d 237, 241 (Ill. App. Ct. 2001). In this case, the district court concluded that the lease provided for attorneys' fees, at least those related to some of Bolger's counterclaims, and awarded him $744,726.87 in fees and expenses and $5338.42 in taxable costs. It later awarded him $70,000 in supplemental attorneys' fees.

Rexam raises two arguments against the fee award. First, it asserts that the district court interpreted the lease incorrectly—in Rexam's view, neither of the two provisions the court found to permit fee shifting actually does. Second, assuming the district court properly interpreted the lease, Rexam asserts that the court awarded Bolger more fees than he was entitled to because he failed to specifically allocate them among (covered) claims arising out of the lease and (uncovered) claims relating to Rexam's holdover tenancy. In a closely related argument, Rexam asserts that Bolger should have only been awarded attorneys' fees for his successful contract claims and not his unsuccessful ones. We take up these challenges in turn, reviewing the district court's interpretation of the lease de novo, *Int'l Prod. Specialists*, 580 F.3d at 594, its interpretation of Illinois law likewise, *Salve Regina*, 499 U.S. at 239, and its fee award using our abuse of discretion standard, *Cintas Corp. v. Perry*, 517 F.3d 459, 469 (7th Cir. 2008).

## 1. Lease Provisions

The district court determined that two lease provisions authorized the award of fees to Bolger. The first, an exceptionally long sentence denoted Article 9(a), reads:

> Indemnification by Lessee. Lessee agrees to indemnify and save harmless Lessor, its successors and assigns, against and from any and all liabilities, losses, damages, costs, expenses, causes of action, suits, judgments and claims by or in behalf of any person, firm, corporation or governmental authority arising from the occupation, use, possession, conduct or management of or from any work, improvement, demolition or thing whatsoever done in or about the Premises or any building or structure thereon or the equipment thereof during any term of this Lease, or arising during said term from any condition of the Premises or of any street, parking lot or sidewalk adjoining thereto or of any vaults, passageways or space therein or appurtenant thereto, or arising from any act of negligence of Lessee, or any of the agents, contractors, or employees of Lessee, or arising from any accident, injury or damage whatsoever, however caused, to any person or to the property of any person or corporation, occurring during said term on, in or about the Premises, or upon or under the sidewalks or streets adjoining thereto, and from and against all costs, reasonable counsel fees, expenses and liabilities incurred in or about any such claim or any action or pro-

ceeding brought thereon, and against all liabil-
ities, losses, damages, costs, expenses, causes of
action, suits, judgments and claims arising from
any failure by Lessee to perform any of the agree-
ments, terms, covenants or conditions of this
Lease on Lessee's part to be performed, other
than those occasioned by any tortious or negligent
act on the part of Lessor, its agents or employees
(in no event shall Lessee, its agents, contractors
or employees be considered agents or employees
of Lessor).

Rexam reads this language to require only that it indem-
nify Bolger against claims by third parties. For support,
it relies not on case law but rather on Articles 9(b) and 10
of the lease, in light of which we must interpret Article
9(a). *See Gallagher*, 874 N.E.2d at 58. Rexam asserts that
Article 9(b), "Liability Insurance," confirms the third-
party orientation of Article 9(a) with its language
requiring Rexam to "maintain as to the Premises general
liability insurance insuring Lessee, Lessor, and Lessor's
mortgagee as their interests shall appear . . . ." And it
claims that if Article 9(a) were to reach "breach of
lease" claims by Bolger, Article 10, "Defaults by Lessee,"
would be rendered "redundant."

We fail to see any language in Article 9(a) that restricts
its application to claims by third parties. *See Balcor Real
Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d
150, 153 (7th Cir. 1996) (interpreting a similarly prolix
indemnity provision). Under Illinois law, we give clear
and unambiguous contract terms their plain meaning,

*Kallman*, 315 F.3d at 736, and "indemnify" means "[t]o reimburse (another) for a loss suffered because of a third party's *or one's own* act or default," Black's Law Dictionary 837 (9th ed. 2009) (emphasis added); *see also Balcor*, 73 F.3d at 153 (discussing and defining indemnify). Article 9(a) plainly requires Rexam to reimburse Bolger for "reasonable counsel fees" he incurs in pursuit of "any such claim or any action or proceeding" he brings in relation to "any condition of the Premises." Even construing the language strictly, as we must do, *see Downs v. Rosenthal Collins Group, LLC*, 895 N.E.2d 1057, 1059 (Ill. App. Ct. 2008) ("Illinois cases have established that attorney fees are only recoverable pursuant to an indemnity contract if such terms are specifically provided for within the contract."); *Powers*, 761 N.E.2d at 241, there is no doubt that Bolger may seek attorneys' fees incurred in disputes over property conditions like the ill repair of the roof. Indeed, we have noted, in a diversity case applying Illinois law, that indemnity clauses are "designed to make the wronged party whole—to put it in the same position it would have occupied had the other side kept its promise." *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 200 F.3d 518, 519 (7th Cir. 1999). Here, if Rexam had repaired the roof and other items it agreed to repair, Bolger would not have had to incur attorneys' fees and legal costs associated with pursuing the breach of contract (counter)claim.

It is also true that if Rexam had not held over, Bolger would not have had to incur legal costs associated with getting Rexam to leave and seeking a penalty against it under the Holdover Statute. Yet Article 9(a)

does not stretch so far as to require Rexam to reimburse Bolger for those attorneys' fees as well. The provision protects Bolger from attorneys' fees he incurs resulting from "occupation . . . of . . . the Premises," but only "during any term of this Lease." The occupation he challenged occurred after the expiration of the lease, not while it was in force; it was for that reason that the Holdover Statute was relevant and a forcible entry action was arguably needed. The final portion of Article 9(a) is no more helpful to Bolger in this respect. It conditions Rexam's indemnification liability on its failure "to perform any of the agreements, terms, covenants or conditions of this Lease." The lease does not require Rexam to vacate the premises upon its expiration. Lessees have a common law duty to timely vacate premises after a lease has terminated, *see Perry v. Evanston Young Men's Christian Ass'n*, 416 N.E.2d 340, 345 (Ill. App. Ct. 1981), but a common law duty is not synonymous with a contractual one. Thus, we conclude that Article 9(a) permits Bolger to recover attorneys' fees associated with his repair claims but not his claims related to Rexam's holdover.

The other contractual articles to which Rexam points do not change our view. Article 9(b) does nothing more that outline Rexam's obligation to insure the premises, to deliver the policies to Bolger, and to ensure that the policies cannot be changed without Bolger's written consent. It operates to shield both Bolger and Rexam against claims by third parties, but does not remove from Rexam the extensive indemnity obligations of Article 9(a). Article 10, which governs the consequences

of any "Events of Default" by Rexam and in its view is the only article that "plainly address[es] lessor-lessee disputes," is not rendered redundant in light of our reading of Article 9(a). There are no conditions precedent to the application of Article 9(a). But Article 10 is only invoked if Rexam engages in one of six specified "Events of Default" during the term of the lease. The provisions may overlap in some cases, but they complement rather than displace one another. *Cf. Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 607 N.E.2d 1204, 1220 (Ill. 1992) (noting that "insurance policies are filled with words which overlap and complement one another," and that such words "add contours" to "general concepts" in the policy).

Indeed, a portion of Article 10—10(d), "Performance by Lessor"—is the second provision under which the district court found Rexam liable for Bolger's attorneys' fees. It provides:

> Performance by Lessor. In the event of the happening of an Event of Default other than the non-payment of rent, Lessor shall have the right at its election, after not less than 30 days' written notice to Lessee, to perform the same for the account of and at the expense of Lessee and if Lessor at any time is required to pay, or elects to pay, any sum of money, by reason of such Event of Default, or if Lessor is required or elects to incur any expense, including reasonable counsel fees, in instituting, prosecuting or defending any action or proceeding instituted by reason

thereof, the sum or sums so paid or incurred by
Lessor, together with interest at the rate of 6% per
annum shall be due and payable by Lessee to
Lessor as additional rent (in addition to other
rents specified in this Lease) upon demand.

Rexam, after acknowledging that Article 10(d) is the
only part of Article 10 that mentions attorneys' fees,
asserts that it is inapplicable here because Bolger failed
to establish that Rexam engaged in one of the six
"Events of Default." It also claims that Bolger did not
demonstrate his compliance with Article 10(d)'s written
notice requirement.

The "Events of Default" are defined in Article 10(a) of
the lease. Rexam is correct that most of the "Events" did
not happen here. Rexam did not file for bankruptcy,
Article 10(a)(i), it did not have a receiver appointed,
Article 10(a)(ii), it did not sell its interest in the premises,
Article 10(a)(iv), it paid its rent without fail even after
expiration of the lease, Article 10(a)(v), and no liquida-
tion or reorganization of it was proposed, Article 10(a)(iii).
The catchall "Event," Article 10(a)(vi), which reaches
any failure "to perform or observe any other require-
ment, or breach any other covenant or agreement of this
Lease" for thirty days after notice of it, however, could
reach at least some of Bolger's repair claims. It is undis-
puted that Bolger notified Rexam that some repairs were
needed in February 2006. Additionally, on July 27, 2007,
Bolger sent a fax to Rexam's Clancy, noting that "the roof
was leaking" as of June 2007 and expressing hope that
"Rexam has cured of [sic] all the repairs and maintenance

issues." When Rexam vacated the property on August 31, 2007—more than thirty days after the July 2007 letter and well over a year after the February 2006 letters—the repairs remained undone. "By reason thereof" these incomplete repairs, Bolger "elect[ed] to incur . . . counsel fees," placing him within the parameters of Article 10(d). Again, however, costs Bolger incurred in contesting Rexam's holdover are not reimbursable; the catchall "Event of Default" cannot reach them because Rexam was not required to vacate by any terms of the lease itself.

We affirm the district court's conclusion that Articles 9(a) and 10(d) of the lease provide a basis for Bolger to recover reasonable attorneys' fees and costs associated with litigating the repair issues.

### 2. Award and Allocation of Fees

The district court awarded Bolger over $800,000 in attorneys' fees. In light of its interpretation of the lease, and its recognition of Illinois's "strict construction" rule concerning contractual fee-shifting provisions, the court stated explicitly that Bolger was "not entitled to any of his fees and costs directly attributable" to his reentry and wrongful possession claims "because they were not covered by any of the fee-shifting provisions contained in the lease." *Rexam Beverage Can Co. v. Bolger*, No. 06 C 2234, 2008 WL 5068824, at *6 (N.D. Ill. Nov. 25, 2008). Yet it also determined that "it [was] not practical for [it] to attempt to determine which fees were devoted to which claims" because, after Bolger tossed his breach of repair claims into the ring on October 11, 2007, "the

two sets of claims were intertwined." *Id.* The court declined Rexam's invitation to engage in a "detailed, hour-by-hour review" of Bolger's costs, *id.* (quoting *Medcom*, 200 F.3d at 521), observed in a footnote that Rexam had similarly declined its own invitation, and attempted to split the difference by awarding Bolger all reasonable fees incurred after October 11, 2007, when he amended his counterclaim to include a claim based on Rexam's duty to repair, *id.* The court reiterated that it would exclude costs that were "on their face related only to Bolger's claims for double rent." *Id.*

Rexam takes issue with the district court's failure to divide Bolger's attorneys' fees into two categories: compensable ones relating to its repair claims, and noncompensable ones relating to all the other issues in the case. It also asserts that the fees in the former category should have been further subdivided into successful and unsuccessful claims, and that only fees associated with the successful claims should have been awarded. We review the fee award for abuse of discretion. That is, we examine the award for reasonableness and reverse only if we are persuaded that it is not at least arguably correct. *See United States v. Thouvenot, Wade & Moerschen, Inc.*, 596 F.3d 378, 386 (7th Cir. 2010).

In light of the indemnity provisions in Article 9(a) of the lease, we conclude that Rexam's second argument, that Bolger should only receive fees for the repair claims on which he was successful, is a nonstarter. Rexam may be correct that Bolger's unsuccessful repair claims, those for the rail spur, Bradley sink, and pipes, were in no

way factually related to his successful repair claims for the dock levelers and roof. The accuracy of that assertion is irrelevant here, though, because all of Bolger's repair claims arose out of the lease. Article 9(a) provides "reasonable counsel fees" for "any . . . claim or any action or proceeding" he brings in relation to "any condition of the Premises," not just those claims on which he prevails. Illinois law is clear that "[w]hen a contract calls for the shifting of attorney fees, a trial court should award all reasonable fees." *J.B. Esker & Sons, Inc. v. Cle-Pa's P'ship*, 757 N.E.2d 1271, 1277 (Ill. App. Ct. 2001). The trial court found it reasonable to award Bolger all its fees related to its repair claims, and that decision stands, notwithstanding Rexam's observation that the fees amount to nearly double the amount Bolger successfully recovered on the claims. *See id.* ("[A]ttorney fees may be reasonable even if the fees are disproportionate to the monetary amount of an award.").

We are more troubled by the potential entanglement of attorneys' fees relating to the repair clams and those not authorized by the lease. In Illinois, it is "incumbent upon the petitioner to present detailed records maintained during the course of the litigation containing facts and computations upon which the charges are predicated." *Kaiser v. MEPC Am. Props., Inc.*, 518 N.E.2d 424, 427-28 (Ill. App. Ct. 1987). In our view, many of the entries in Bolger's attorneys' bills leave much to be desired in this respect. Entries such as "[r]eviewing case law" and "[r]eviewing correspondence, deposition transcripts, and pleadings," while perhaps adequate to inform Bolger of his attorneys' progress, *see Mountbatten*, 812 N.E.2d at

105, were insufficiently detailed for the district court to determine to which cause of action the efforts were directed.

That said, however, we recognize Illinois courts' determination that even "terse, and concise" attorneys' bills can be "adequate." *Id.* Despite their flaws, the bills clearly indicate which attorney or paralegal performed each task and how long he or she took to complete it. *See Kaiser*, 518 N.E.2d at 427 (requiring only a specification of "the services performed, by whom they were performed, the time expended thereon and the hourly rate charged therefor"). And moreover, Bolger paid all the bills; that is a strong indication that the charges they contained were reasonable. *See Medcom*, 200 F.3d at 520. The district court was not obligated to conduct a line-by-line review of the bills to assess the charges for reasonableness.

This does not get us out of the entanglement quagmire, however. For what Rexam fundamentally challenges is the reasonableness of the district court's "split the difference" approach of dividing the bills into pre- and post-October 11, 2007 categories. While we do not go so far as to endorse the district court's fee award methodology or its application in future cases, we hold that the district court did not abuse its discretion in employing a "practical solution" to the fee division problem posed here. The district court carefully restricted the award to exclude items clearly attributable to the extracontractual claims, and it expressly excluded expenses associated with an expert who testified only as to the market value of the

facility. It attempted to ensure that Rexam's liability for fees did not attach until there was a fair possibility that the work being billed was related to Bolger's contract claims; removing the roughly one-third of the fees accrued prior to October 11, 2007 was a reasonable step toward that end. Asking the court to do more here would place any resultant fee award much further into the realm of conjecture, *see In re Estate of Bitoy*, 917 N.E.2d 74, 85 (Ill. App. Ct. 2009), and would undermine its broad discretionary authority to fashion appropriate attorneys' fees.

Under the deferential abuse of discretion standard, the district court's award of attorneys' fees to Bolger should stand.

## III. Conclusion

The judgment of the district court is AFFIRMED except on the issues of the fair market rental value of the Loves Park warehouse and the calculation of damages under the Holdover Statute. With respect to those issues, we VACATE Bolger's Holdover Statute award of $1,156,232.24 (which includes the $101,471.59 setoff) and REMAND for a determination of the fair market net rental value of the property and the assessment of a penalty equal to double that value for the duration of Rexam's holdover. Because this remand simply requires a redetermination of the damages award and not a new trial, Circuit Rule 36 does not apply.