In the

# United States Court of Appeals

### For the Seventh Circuit

_____

Nos. 18-2850, 18-2851, 18-3725, & 19-1054

MERLE L. ROYCE,

*Plaintiff-Appellee,*

*v.*

MICHAEL R. NEEDLE P.C.,

*Defendant-Appellant,*

*v.*

AMARI COMPANY, INC., *et al.,*

*Defendants-Appellees,*

*and*

RICHARD JOSEPH COCHRAN, *et al.,*

*Appellees.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15-cv-00259 — **Rebecca R. Pallmeyer**, *Chief Judge.*

_____

ARGUED JANUARY 14, 2020 — DECIDED FEBRUARY 20, 2020

_____

Before WOOD, *Chief Judge*, and ROVNER and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. This dispute over attorney's fees has a long, tortured history. Not because it is unduly complex or involves novel legal issues, but because one of the attorneys—Michael R. Needle—protracted it every step of the way. He routinely and unapologetically tested the district court's patience, disregarded court orders, and caused unnecessary delays. As a result, the district court sanctioned Needle multiple times for "obstructionist and vexatious" tactics.

The fee dispute arose only because Needle steadfastly took an objectively frivolous position that he and his co-counsel, Merle L. Royce, were entitled to the lion's share—almost sixty percent—of their clients' settlement in an underlying suit as attorney's fees. Even Royce rejected Needle's position because the plain language of the contingent fee agreement provided that attorney's fees shall be one-third of the settlement. The district court found the same, and then decided a sub-dispute over the division of the aggregate attorney's fee between Royce and Needle under a separate co-counsel agreement. The court awarded Needle sixty percent and Royce forty percent of the aggregate attorney's fee.

Needle appeals both decisions relating to the attorney's fee, the sanctions assessed against him, and a host of other perceived errors. We affirm the judgment in all respects because the district court's rulings were correct, the sanctions were appropriate, and Needle's other arguments are baseless.

## I. Background

At its core, this is a simple contract dispute. It became protracted, however, and devolved into a three-and-a-half-year

row with over a thousand docket entries. Many, if not most, of the filings were unrelated to resolving the merits. Our job, however, is made considerably easier because the district court—first Judge Shadur and then Judge Pallmeyer—effectively managed this problematic litigation.

## A. The underlying RICO action

This case stems from an underlying civil Racketeer Influenced and Corrupt Organizations (RICO) action filed in 2007, *Amari Inc., et al. v. John Burgess, et al.*, No. 07-cv-1425 (N.D. Ill.). Though not initially plaintiffs' counsel, Needle and two Illinois attorneys eventually came to represent the *Amari* plaintiffs—a group of sixteen individuals and companies. Needle is a Pennsylvania attorney and the "sole attorney, shareholder, officer and employee" of his law firm, Michael R. Needle P.C. ("Needle P.C."). (In every practical sense, Needle and Needle P.C. are the same.) The three attorneys drafted and executed a contingent fee agreement with their clients. According to Needle, the fee agreement went through five drafts.

The two Illinois attorneys would both later withdraw from the representation, so Needle recruited another Illinois attorney to serve as his co-counsel and local counsel, Royce. Needle and Royce entered into a co-counsel agreement that set forth their division of any attorney's fee received in the RICO action. Specifically, they agreed to split half of any fee equally and the other half proportional to the time each spent on the matter.

Together Needle and Royce litigated the *Amari* suit for several years before successfully settling the case in November 2013. Pursuant to a confidential settlement agreement, the

parties settled the RICO action for $4.2 million. Importantly, the settlement agreement provided only for a single lump-sum settlement amount of $4.2 million (payable in installments according to a set schedule), without any further provisions relating to attorney's fees, costs, expenses, or the like. All payments were made to Royce as escrow agent.

## B. The attorney's fee dispute

Instead of bringing an end to the matter, Needle was not happy with his cut of the settlement. He asserted that the attorneys, he and Royce, were entitled to a greater fee amount than Royce and the client group did. Specifically, Needle wanted $2.5 million, or approximately sixty percent, of the settlement amount as attorney's fees, leaving the plaintiffs—his clients—with $1.7 million. Needle and Royce also disagreed over the appropriate division of the attorney's fee between themselves. The conflict froze the settlement proceeds in escrow, so Royce filed an interpleader action seeking a determination of the correct disbursements under the contingent fee agreement and the co-counsel agreement.

## C. The district court proceedings

In the interpleader action over the attorney's fee, Needle P.C. was initially represented by Cafferty Clobes Meriwether & Sprengel LLP, a local law firm. Needle P.C. answered the complaint and filed extensive, multicount counterclaims against both Royce and the *Amari* plaintiffs. In the counterclaims, Needle P.C. sought a constructive trust on the escrow account; a declaratory judgment regarding the division of the settlement fund between the plaintiffs and the attorneys and between Royce and Needle; and a declaratory judgment that section IV.1(A) of the contingent fee agreement (as opposed

to section IV.1(B)) governed the attorney's fee. Needle P.C. also brought claims against Royce for misrepresentation and conversion. We are centrally concerned with Needle P.C.'s counterclaim that section IV.1(A) of the fee agreement controls the contingent fee dispute.

The core of Needle P.C.'s position—which underlies this entire litigation—was that the attorney's fee was "separately negotiated" during the RICO suit settlement negotiations and included in the lump-sum settlement amount, thus triggering subparagraph (A) of the fee provision: "(A) any fee paid to us … pursuant to any settlement agreement." The district court expressed to Needle P.C. on at least three different occasions that it had serious concerns that Needle P.C. could present this claim consistent with Federal Rule of Civil Procedure 11(b). Needle P.C. did not heed the warning and continued to assert the counterclaim. So Royce and the *Amari* plaintiffs moved to dismiss the claim and also for Rule 11 sanctions.

The district court dismissed the count asserting that section IV.1(A) governed the attorney's fee determination, finding that Needle P.C.'s arguments were "not merely wrong but frivolous, disregarding what anyone having taken a first-year contracts class could identify as the pivotal legal issues" and "utterly devoid of merit." The dismissal came with an award of sanctions against Needle P.C. and Cafferty Clobes, which is discussed later.

### 1. Needle's pro hac vice admission

Following briefing on the motion to dismiss and sanctions, Cafferty Clobes moved to withdraw as Needle P.C.'s

counsel.[1] Two months passed before a new attorney sought to appear only as local counsel and Needle moved for leave to appear pro hac vice on behalf of Needle P.C. The motion was immediately met with opposition. Royce raised a concern that Needle's representation of Needle P.C. would implicate the lawyer–witness rule, while the *Amari* plaintiffs pointed out an alleged inaccuracy—or outright false representation—in Needle's application for admission. The pro hac vice form asks if the applicant is "currently the subject of an investigation of the applicant's professional conduct." Needle checked the box for "No." According to the *Amari* plaintiffs, this was false because at the time there were two active complaints and investigations pending before the Pennsylvania attorney disciplinary board. Though Needle attached an addendum to his application explaining that during a telephone call with a disciplinary board staff attorney he was "informed" and "believed" there was no active investigation relating to him, he never received written notification of a disposition of either complaint. The *Amari* plaintiffs also contacted the disciplinary board and were informed that both investigations of Needle were still active.

The district court attempted to address Needle's pro hac vice application and the attendant issues at a status conference on October 19, 2015. It did not go well. The court permitted Needle to appear telephonically, at Needle's request, so

---

[1] As noted, the district court sanctioned Cafferty Clobes for the Rule 11 violations that occurred while serving as counsel of record and before its withdrawal from the case. Cafferty Clobes later apologized to the court and opposing counsel for its role in filing the frivolous pleading and cooperated with opposing counsel to amicably pay its share of the fee award without objection or further litigation.

that he did not have to travel from Philadelphia to Chicago. But Needle failed to call the court at the scheduled time. When Needle's local counsel then called him from the courtroom, Needle blamed court staff for giving him the wrong number. The bigger problem, however, was that Needle took the call on his cell phone in public from a courthouse in Philadelphia. Needle could not participate effectively because of the ambient noise on his end. Even though counsel for Royce, counsel for the *Amari* plaintiffs, and local counsel were all present in court, Needle prevented the hearing from going forward as planned.

The court was understandably frustrated—it accommodated Needle by allowing him to participate telephonically and Needle abused that privilege. The court continued the hearing to another date and ordered Needle to pay the costs of counsel's in-person attendance at the aborted hearing.

At the rescheduled hearing, Needle asserted only that the lawyer–witness objection to his pro hac vice admission was premature. But the legal issues at hand would inevitably require Needle's testimony, and thus the lawyer–witness objection was ripe for ruling. The court denied Needle's motion to appear pro hac vice and directed local counsel to discuss the scope of his representation of Needle P.C. and whether he would now serve as lead counsel. Three days later, local counsel withdrew.

### 2. *Needle P.C.'s second amended pleadings*

Needle P.C. went the next six months without counsel and the litigation stalled. Needle himself decided to "ignor[e] the litigation" by "not being on the telephone, not talking to anybody about it." In an effort to get the case back on track, the

court reluctantly permitted Needle to appear pro hac vice. Further, the court permitted Needle to refile the second amended counterclaims that he had previously attempted to file without leave. In doing so, however, the court gave Needle a strict order: "File it, but don't make any substantive changes." Needle obviously understood, how could he not, responding, "I am not going to other than what I just said" about correcting two typographical errors.

Mere days after the hearing Needle indicated his intent to ignore the court's order—and his own promise to the court— by telling opposing counsel that he was "working on" the revised versions of the second amended pleadings, which "would add certain details." Judge Shadur held another hearing for the sole purpose of making an already plain court order even more plain. Nonetheless, later that day, Needle filed a motion for leave to file the second amended pleadings under seal, attaching the proposed filings that contained numerous substantive changes. This brought on a new round of motions, including for sanctions.

The district court was not amused. Judge Shadur nevertheless gave Needle yet another chance to file compliant pleadings. The third time was not a charm: Needle still did not obey the court's order. Because of Needle's "stubborn refusal to comply" with the court's order to refile the pleadings with only promised typographical corrections, Judge Shadur rejected Needle P.C.'s proposed amended pleadings. Instead, Judge Shadur treated the versions that Needle originally attempted to file without leave to do so as Needle P.C.'s operative pleadings. The court also granted Royce's fee petition in the amount of $24,480, and further ordered that Needle pay an equal amount, $24,480, to the Clerk of Court as a sanction

for the "burdens thrust on the judicial system by Needle's conduct."

### 3. Delays in the litigation

At this point, after a year and a half of proceedings and over three hundred docket entries, the case still had not progressed past the pleading stage. In addition to the amended pleading debacle and willful violation of the court's order, over the course of the next several months Needle repeatedly and continuously failed to adhere to scheduling deadlines and requested extensions at the last minute—sometimes on the actual due date of a submission—which in turn would upset preset schedules and hearings. To make matters worse, while he requested extra time to complete necessary filings, Needle took the time to file several lengthy submissions related to ancillary and irrelevant issues. "Because of the inappropriateness of Needle's conduct during the limited period since he was granted pro hac vice status, that status [was] revoked," and Needle was "ordered to obtain responsible new counsel to represent" Needle P.C. Further, the court struck without prejudice Needle P.C.'s second amended counterclaims so that "new counsel [could] give prompt consideration to what portions of the now-stricken pleadings by Needle P.C. can properly be considered for reassertion in compliance with the objective and subjective good faith demanded by Rule 11(b)." Consequently, two years into the litigation, Needle P.C. still did not have an operative pleading.

A month went by with Needle P.C. failing to retain new counsel, so Needle filed a motion for extension of time to find counsel. The court granted the motion, ordering Needle to provide regular updates on his efforts, but also temporarily reinstating Needle's pro hac vice admission on a limited basis

so the case could proceed "in an orderly way." The order requiring Needle P.C. to obtain independent counsel remained intact.

Three months later Needle still had not retained counsel for Needle P.C., nearly fifteen months after local counsel withdrew. Due to the failure to "comply with [the] Court's repeated orders to obtain counsel … coupled with (a) the litigation tactics regularly employed by Needle in this action as well as (b) the false statements previously revealed to have been made by Needle in having sought and having obtained pro hac vice status in the first place," Judge Shadur revoked Needle's pro hac vice status once again.

Royce then moved for an order of default because Needle P.C. had failed to defend the action by not obtaining counsel for an unjustifiable period of time. The court set a briefing schedule, under which Needle requested and was given sixty days to respond. Like Groundhog Day, the day before his response brief was due Needle moved for an additional two weeks to file it. Needle claimed he just discovered he had not ordered a transcript he apparently needed—an entirely avoidable delay. The court granted the extension, but not without consequences. The court imposed sanctions under 28 U.S.C. § 1927 in the form of the reasonable costs and fees that Royce's counsel incurred as a result of the further delay and the additional appearance at a preset hearing.

Judge Shadur was set to retire soon, so the fee action was randomly reassigned to Judge Pallmeyer pursuant to 28 U.S.C. § 294(b). When the case came to Judge Pallmeyer in June 2017, it was two-and-a-half years old and had largely been consumed by needless disputes.

At that point, Judge Shadur had ruled that Needle and Royce together were entitled to one-third of the RICO settlement. Two disputes remained. The first was whether retainer payments made to the attorneys during the RICO action were to be deducted from the aggregate attorney's fee. The second was the division of the aggregate attorney's fee between Royce and Needle pursuant to the co-counsel agreement.

### 4. Deduction of retainer payments

Judge Pallmeyer set an evidentiary hearing on the matter of the retainer payments. Royce and the *Amari* plaintiffs moved to bar Needle from appearing or participating as counsel at the evidentiary hearing based on his past conduct and the revocation of his pro hac vice status. Judge Pallmeyer granted the motion to the extent Needle was barred from appearing as counsel for Needle P.C., but permitted Needle to participate in the hearing to represent his personal interests.

During the evidentiary hearing, Needle cross-examined the two witnesses who testified and presented himself as an additional witness. He conducted a direct examination of himself, testifying in narrative fashion, and was cross-examined as well. Needle also introduced exhibits during the evidentiary hearing. Indeed, Needle had sent opposing counsel about 1,400 pages of proposed exhibits in advance of the hearing.

After the evidentiary hearing, Judge Pallmeyer ruled that retainer payments totaling $62,789 were authorized by the management committee and by Needle, and thus were to be deducted from the share of attorney's fees. As part of her decision, Judge Pallmeyer noted that she "d[id] not find Mr. Needle's position credible."

### 5. *The Royce–Needle co-counsel fee division*

Following the determination regarding the retainer payments, the Royce–Needle fee split, which required Needle P.C.'s direct participation, was the sole remaining issue. The district court yet again ordered Needle to retain counsel for Needle P.C., and gave him thirty days to do so. On the last day of the deadline, three attorneys from the law firm Cozen O'Connor filed appearances for Needle P.C. The representation did not last long, less than three months, before Cozen O'Connor withdrew from the case for good cause.[2] Another attorney, Frank Fusco, substituted as counsel for Needle P.C. and continues to represent Needle P.C. on appeal.

The co-counsel agreement, which Needle drafted, provided that any attorney's fee

> will be divided as follows: half of any such fee will be divided equally, regardless of time or effort of either of us, and the second half of any such fee will be divided in proportion to the time you and I have spent on this matter, regardless of any hourly rate.

The district court first found that the fee-splitting provision complied with the relevant rules of ethics and thus was valid. Therefore, Needle and Royce would divide half of the fee equally and the other half proportionally.

As to the proportional amount, Needle argued that the appropriate time split was 75/25 in his favor. After reviewing the

---

[2] The circumstances surrounding Cozen O'Connor's withdrawal as counsel for Needle P.C. and whether Cozen O'Connor is entitled to its fees in *quantum meruit* are the source of another dispute and are the subject of a separate opinion issued today.

briefs and the records, the court estimated that the proper proportional time division was 70/30 in favor of Needle, only five percent less than Needle advocated. Therefore, at the end of the day, Needle was entitled to sixty percent of the aggregate contingent fee amount ((½ x 50%) + (½ x 70%)) and Royce forty percent ((½ x 50%) + (½ x 30%)).

### 6. *The end of the fee dispute*

The district court entered final judgment on July 24, 2018. The judgment precisely distributed the RICO action's $4.2 million settlement (now $4,062,476.01 being held in the court's registry) among all *Amari* plaintiffs and all attorneys.

After the final judgment was entered, Needle P.C. moved for a new trial or to alter the judgment pursuant to Federal Rule of Civil Procedure 59. The crux of the motion was that (1) Needle P.C. was not permitted to reinstate the second amended counterclaim when it obtained new counsel, (2) the court did not engage in the requisite fact finding required to determine the allocation of the aggregate attorney's fee between Royce and Needle, and (3) Needle P.C. is entitled to a new evidentiary hearing on the retainer issue because Needle was not permitted to represent the professional corporation and submit pretrial and posttrial submissions on its behalf. Judge Pallmeyer denied the motion. The issues overlap with the issues presented on appeal, so we will address them as appropriate below. Significantly, though, regarding Needle P.C.'s challenge to the reinstatement of the second amended counterclaim, the court noted that after Judge Shadur initially struck it, both Cozen O'Connor and Mr. Fusco had ample opportunity to review the stricken pleading and seek reinstatement (or leave to file a newly amended pleading) but did not

do so until Mr. Fusco eventually did in the Rule 59 motion *after* final judgment.

The fee action was finally disposed of in the district court after three-and-a-half-years of litigation. This appeal by Needle P.C. followed.

## II. Discussion

Needle P.C. raises myriad issues on appeal. In general terms, its challenges relate primarily to jurisdiction, the determination of the aggregate attorney's fee under the contingent fee agreement, the determination of the attorney's fee split between Royce and Needle pursuant to the co-counsel agreement, and the sanctions imposed against Needle.[3] Though many of the arguments are underdeveloped and impenetrable, we address each argument raised in turn.

### A. Jurisdiction

Needle P.C. starts with jurisdiction, as we do ourselves, and asserts that the district court lacked "interpleader jurisdiction" to hear the fee action. As best can be discerned, Needle P.C. contends that the parties should have submitted the entire attorney's fee dispute to arbitration instead of bringing it in federal court based on an arbitration provision. This is

---

[3] Needle P.C. also purports to raise another issue on appeal, that it was error to allow the management committee to issue a schedule of distribution. But Needle P.C. lacks standing to bring this challenge. The distribution schedule sets forth what amount of the settlement (less the one-third attorney's fee) each *Amari* plaintiff is to receive. It in no way affects Needle P.C.'s share of the attorney's fee. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

not a jurisdictional argument, however, but a contractual right-to-arbitrate argument.

The presence of a contractual arbitration provision cannot confer federal jurisdiction. *See Vaden v. Discover Bank*, 556 U.S. 49, 58–59 (2009); *Magruder v. Fid. Brokerage Servs. LLC*, 818 F.3d 285, 287 (7th Cir. 2016) ("The Federal Arbitration Act, 9 U.S.C. §§ 1–16, does not grant federal jurisdiction."). But the inverse is not also true; if there is an independent basis for federal jurisdiction, an arbitration provision does not strip the federal court of its jurisdiction. "Subject-matter jurisdiction cannot be forfeited or waived … ." *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009). On the other hand, a party can waive a contractual right to arbitration. *Kawasaki Heavy Indus., Ltd. v. Bombardier Recreational Prod., Inc.*, 660 F.3d 988, 994 (7th Cir. 2011). And to the extent Needle had a right to arbitrate the attorney's fee dispute, he clearly waived it.

We will infer waiver of the right to arbitrate if, considering the totality of the circumstances, a party acted inconsistently with the right to arbitrate. *Kawasaki*, 660 F.3d at 994. This includes, among several other factors, "the diligence or lack thereof of the party seeking arbitration," which should "weigh heavily" in the analysis. *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995). Needle never moved to compel arbitration and invokes the arbitration provision for the first time on appeal. A delay of over three-and-a-half years is alone sufficient to find waiver, particularly where Needle actively participated in the litigation. *See St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Aluminum Prod. Co.*, 969 F.2d 585, 589 (7th Cir. 1992). But Needle's delay does not stand by itself.

On appeal, Needle tells us that he "questioned the use of interpleader" before the district court. Quite the opposite, Needle *explicitly* argued to the district court that "the binding mediation provision does not encompass or require a stay of Needle's counterclaims," which, like the matters the court adjudicated, involved "the determination of the aggregate attorneys' fee." Reading further, "Needle respectfully submits that [the federal court] is the proper forum to resolve all claims to the Settlement fund. Accordingly, the binding mediation provision should not stay any of the proceedings in this case." Needle's affirmative, unequivocal representation to the district court constitutes a waiver of the right to arbitrate and slams the door shut on any assertion that he can invoke it now. *See Cabinetree*, 50 F.3d at 390 ("[A]n election to proceed before a nonarbitral tribunal for the resolution of a contractual dispute is a presumptive waiver of the right to arbitrate.").

We also confirm the district court's subject-matter jurisdiction to the extent Needle P.C. suggests it was lacking. "For that purpose, we must look to the suit as a whole, and we must assess whether jurisdiction was proper as of the time the suit commenced." *Autotech Techs. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 742 (7th Cir. 2007). Royce alleges that diversity jurisdiction existed at the time he filed his interpleader complaint. Diversity jurisdiction requires (1) complete diversity of citizenship between the plaintiffs and the defendants, and (2) an amount in controversy that exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a); *see, e.g.*, *Del Vecchio v. Conseco, Inc.*, 230 F.3d 974, 977 (7th Cir. 2000). Neither requirement is in dispute. In fact, Needle P.C.'s principal brief readily admits as much: "There was diversity. … The settlement exceeded $75,000, as did many claims on it." And our own independent review confirms that the

requirements of § 1332(a) were met in this case. We are satisfied that the district court had jurisdiction over Royce's interpleader claim.

**B. Interpretation of the contingent fee agreement**

Needle P.C. challenges the district court's motion to dismiss ruling, which he contends misconstrued the plain meaning of "pursuant to" in the attorney's fee provision of the contingent fee agreement. We review a district court's dismissal for failure to state a claim without deference. *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1060 (7th Cir. 2020). We take all well-pleaded facts as true and draw all reasonable inferences in the nonmoving party's favor. *Id*. at 1060–61.

The attorney's fee provision, section IV.1 of the contingent fee agreement, provides that Needle and Royce, together,

> will be entitled to a contingent fee equal to the greater of: (A) any fee paid to us pursuant to a judgment and award of fees under the RICO or other fee shifting statute or pursuant to any settlement agreement, or (B) one-third of any recovery actually received, with the recovery to be computed as any and all damages, treble damages, punitive damages, costs, expenses, attorney's fees or other compensation actually paid, whether pursuant to settlement agreement or judgment, less any retainer paid ….

Needle P.C. claims that subparagraph (A) of the fee provision controls the attorney's fee, as opposed to subparagraph (B). This is because, according to Needle, a $2.5 million attorney's fee was "separately negotiated during the discussions that led to the Settlement" of the RICO action, which was allegedly included in the lump-sum settlement amount. Under his

reading of the provision, then, subparagraph (A) applies because the attorney's fee is a "fee paid to us … pursuant to any settlement agreement." Otherwise, the one-third floor provided for in subparagraph (B) would net him far less.

The argument turns on the interpretation of a contract for fees, so we look to Illinois contract law. *In re Solis*, 610 F.3d 969, 972 (7th Cir. 2010). In Illinois, words in a contract that are clear and unambiguous must be given their plain and ordinary meaning. *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011); *see also In re Solis*, 610 F.3d at 972 ("In Illinois (as in all states), a court gives contract terms their 'common and generally accepted meaning,' as informed by the 'context of the contract as a whole.'" (quoting *Krilich v. Am. Nat'l Bank & Tr. Co. of Chi.*, 778 N.E.2d 1153, 1164 (Ill. App. Ct. 2002)). Here, the contingent fee agreement is clear on its face and its plain meaning easily resolves the issue.

It is uncontested that the RICO settlement agreement does not expressly provide for attorney's fees. The settlement agreement provides for a lump-sum settlement payment of $4.2 million to "Plaintiffs" and sets forth a payment schedule. There is no term, reference, or hint in the settlement agreement to attorney's fees. Not even an implication. We could stop here—it defies common sense to argue that that an attorney's fee is "pursuant to" a settlement agreement that says absolutely nothing of the sort.

Nevertheless, Needle P.C. insists that "pursuant to" carries a broad meaning that does not demand that the settlement agreement state the attorney's fee. Of course, "pursuant to" can have multiple dictionary definitions. Indeed, "pursuant to" can mean: "In compliance with; in accordance with; under;" "As authorized by; under;" or "In carrying out."

*Pursuant to*, Black's Law Dictionary (11th ed. 2019); *see also Fruitt v. Astrue*, 604 F.3d 1217, 1220 (10th Cir. 2010) (using same definitions of "pursuant to"); *Acad. Imaging, LLC v. Soterion Corp.*, 352 F. App'x 59, 74 (6th Cir. 2009) (same); *Tenn. Gas Pipeline Co. v. FERC*, 17 F.3d 98, 104–05 (5th Cir. 1994) (same). But under any definition, the meaning is the same in this context. If the alleged attorney's fee is "authorized by" the settlement agreement, or the attorney's fee is to be paid "in compliance with" or as part of "carrying out" the settlement agreement, then the attorney's fee must find its roots in the settlement agreement. There must be *something*, but there is nothing. There is no plausible construction of "pursuant to" that would mean an allegedly "separately negotiated," noncontractual, and nonidentifiable fee is a fee paid "pursuant to" the settlement agreement.

Reading the contract as a whole points to the same conclusion. The contingent fee agreement uses the phrase "pursuant to" twice in subparagraph (A). While Needle focuses exclusively on the second use in subparagraph (A), "pursuant to any settlement agreement," the first use undercuts any argument he may have had. The first half of subparagraph (A) states: "any fee paid to us pursuant to a judgment and award of fees under the RICO or other fee shifting statute." A fee paid "pursuant to" a statutorily authorized fee award is necessarily expressly stated, at least in some minimal form. No judgment could "award" attorney's fees pursuant to a fee shifting statute yet leave the actual "award" unstated. So when the very same phrase "pursuant to" is used in the second half of the clause, we construe it the same. An attorney's fee paid "pursuant to" a settlement agreement is a fee at least minimally indicated therein.

Needle's argument also suffers from a fatal factual flaw. Over the course of many years of litigation, Needle has relentlessly avowed that the $2.5 million attorney's fee was "separately negotiated," yet he has never identified a single piece of evidence that supports his claim. We scoured the record too and came up empty. Tellingly, one of Needle's own clients foreshadowed this outcome when this fee dispute first materialized: "There is no question, the settlement language clearly states the plaintiffs have been awarded 4.2 million dollars. There is NO MENTION of what the fees are to be paid to attorneys and no mention of awarding of fees under RICO." That is exactly right.

The plain language of the contingent fee agreement dictates that the attorney's fee is determined under section IV.1(B), or one-third of the settlement payment, less any retainer fees.

### C. Striking the second amended pleadings

Next, Needle P.C. argues that it was "improperly prevented from proceeding on well-founded defenses and claims." The challenge is a mishmash of statements and arguments, but appears to stem from the district court's decision to strike Needle P.C.'s second amended pleadings without prejudice. The court, on its own or on motion, "may strike … any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). We review a district court's decision to strike for an abuse of discretion and will disturb that decision only if it is unreasonable and arbitrary. *Delta Consulting Grp. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009).

Recall that after Needle P.C. had gone six months without counsel and brought the case to a "screeching halt," Judge

Shadur reluctantly permitted Needle to appear pro hac vice to move the proceedings along. In doing so, Judge Shadur also permitted Needle to refile his second amended counterclaims, which had previously been stricken when Needle attempted to file the pleadings without leave and while not authorized to appear in the case. But the court made clear on several occasions that Needle was only to refile the second amended pleadings and was not to make any substantive changes. Needle flagrantly ignored Judge Shadur's repeated orders and filed the second amended counterclaims with numerous substantive changes. Because Needle did so, the court opted to ignore the newly filed second amended pleadings and treat the original filed versions of the second amended counterclaims as Needle P.C.'s operative pleadings.

Needle's pro hac vice status lasted only four months. In addition to deliberately disregarding the court's order about filing the second amended pleadings, Needle continued to engage in "obstructionist tactics" and disrupt the orderly progress of litigation. "Because of the inappropriateness of Needle's conduct during the limited period since he was granted pro hac vice status," Judge Shadur revoked it. The court also struck without prejudice Needle P.C.'s second amended counterclaims. But, critically, the court did so with the express intention that "new counsel should give prompt consideration to what portions of the now-stricken pleadings by Needle P.C. can properly be considered for reassertion in compliance with the objective and subjective good faith demanded by Rule 11(b)."

When Needle finally obtained independent counsel for Needle P.C., first Cozen O'Connor and then Mr. Fusco, neither set of counsel moved to reassert the second amended

counterclaims (or any version of an amended pleading) as Judge Shadur invited. In fact, Cozen O'Connor sought to file amended pleadings but it was Needle who "rejected Cozen's advice and only authorized Cozen to file a motion for leave to file the sur-reply and not the amended answers." It was not until after final judgment was entered that Mr. Fusco even attempted to reinstate the stricken pleadings; but at that point it was too little too late.[4]

The court did not abuse its discretion in striking Needle P.C.'s pleadings, particularly because Judge Shadur did so without prejudice and with an explicit direction to new counsel to seek reinstatement if appropriate. Rather, given the litigation history up until that point—almost two years—the decision to strike the pleadings subject to an investigation by independent counsel was entirely reasonable and certainly not arbitrary. Needle P.C. was in no way "prevented" from proceeding on any well-founded claims had counsel sought to timely reassert them.

And even if Judge Shadur's decision to strike the pleading is not viewed through the lens of Rule 12(f), district courts "possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (quotations omitted). That authority includes "the ability to fashion an

---

[4] Further, during a status conference after Mr. Fusco appeared and before final judgment was entered, opposing counsel alerted the court, and thus Mr. Fusco, that Needle P.C.'s pleadings had been stricken without prejudice subject to new counsel vetting them and that no one has yet sought to reassert them. It was not for another three months, until after final judgment, that Mr. Fusco moved to do so.

appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). We need not dwell on this discussion; Needle's conduct is well-documented and speaks for itself, particularly with respect to the second amended pleadings, and the district court would have been well within its discretion to strike the pleadings as a sanction for Needle's misconduct.

### D. Revocation of Needle's pro hac vice status

As noted above, the district court revoked Needle's pro hac vice admission twice during the litigation. But when Judge Shadur did so the second time, Needle claims the *sua sponte* revocation violated his Fifth Amendment due process rights because he was entitled to notice and a hearing. We review a district court's decision to revoke an attorney's admission pro hac vice for an abuse of discretion.

For support of this position, Needle relies on *Johnson v. Trueblood*, 629 F.2d 302 (3d Cir. 1980) (per curiam). In that case, the Third Circuit "believe[d] that some type of notice and an opportunity to respond are necessary when a district court seeks to revoke an attorney's pro hac vice status." *Id*. at 303. As to how much is "some" and what "type" of notice is required, "flexibility is dictated because in some cases there may be circumstances where formal notice is inappropriate." *Id*. at 303–04. The form of the notice is left to the district court's discretion, as long as the notice "adequately inform the attorney of … the conduct of the attorney that is the subject of the inquiry, and the specific reason this conduct may justify revocation." *Id*. at 304. Nor is a "full scale hearing … required in every case," only "a meaningful opportunity to respond to identified charges." *Id*. We agree with *Johnson*'s general principle that some form of notice and opportunity to respond is

required before a court revokes an attorney's pro hac vice admission. But *Johnson* does not require the procedural safeguards that Needle suggests, such as a full hearing in front of a different judge.

Admission pro hac vice is a privilege, not a right. *See Leis v. Flynt*, 439 U.S. 438, 442 (1979) (per curiam). We recognize that attorneys may have an interest in that privilege, but that does not abridge the district court's inherent authority "to control admission to its bar and to discipline attorneys who appear before it." *Chambers*, 501 U.S. at 43 (citing *Ex parte Burr*, 9 Wheat. 529, 531 (1824)); *In re Snyder*, 472 U.S. 634, 645 n.6 (1985) ("Federal courts admit and suspend attorneys as an exercise of their inherent power."). When an attorney abuses the privilege of appearing pro hac vice, the district court may revoke that privilege as a sanction for misconduct. All that is required before an attorney's admission pro hac vice is revoked is adequate notice of the conduct in question and a reasonable opportunity to be heard on the matter. We leave it to the sound discretion of the district court to determine the appropriate notice and opportunity to respond in each individual case.

Whatever minimal forms of notice and hearing may be required, this is not the case to define the contours. Needle had ample notice of the subject misconduct and more than enough opportunity to respond and conform his behavior to appropriate professional standards before the court revoked his pro hac vice status. Here is just a small sampling of the notice Needle received:

- "I must tell you that you try anybody's patience."

- "[I]t is inappropriate for you to seek to take ad-vantage of a grant that was simply intended to make sure that we had an un-redacted version available … because we then get ourselves into the kind of discussion that has interrupted this case to an extraordinarily extent by what I view as digres-sions."

- "You know, what I have seen here, as I indicated, is a continued pattern of really distorted aspects of this thing by taking snippets out of context and then attempting to, I think, twist them to Mr. Nee-dle's own use."

- "[A] case that has proved itself to be endless and to which endlessness you have contributed extraordi-narily."

- "[This case has] been frustrated by Needle's having preferred—not for the first time—to pursue his own agenda in generating work product on suit-re-lated matters, rather than complying with the court-ordered timetable that would have given other counsel and this Court the intended oppor-tunity to review his input in advance of the hear-ing."

- "[T]he nature of Needle's irresponsible behavior cannot be permitted to paralyze this litigation and thus to keep it from reaching the merits as to all the parties to this litigation."

Indeed, the court had already revoked Needle's pro hac vice once and then reinstated it before revoking it again for his continued misconduct. It is unclear what additional notice

Needle believes he is entitled to. And not only could Needle have been "heard" on the matter by simply conducting himself appropriately, he also participated in every hearing and had the opportunity to respond to each of the court's admonitions.

Finally, we note that Needle's criticism is questionable to begin with. Only one month after Needle's pro hac vice status was revoked the second time, Judge Shadur again reinstated it on a limited basis so that Needle could address the legal questions raised by the pleadings. Further, Judge Shadur indicated that Needle could continue to appear pro hac vice if he obtained independent counsel to act as co-counsel. Needle's complaint is much ado about nothing.

### E. The alleged "default"

Needle P.C. repeatedly claims that it was defaulted. There is no entry of default in the record. Although Royce did file a motion for default because Needle P.C. had "'failed to … defend' by failing to obtain counsel for nearly 11 months," the court never granted that motion and Needle P.C. was never otherwise defaulted. Needle P.C. litigated the case to the end.

### F. The co-counsel fee division

When Judge Pallmeyer was reassigned the case, Judge Shadur had already ruled that the aggregate attorney's fee was one-third of the settlement amount under the fee agreement. What was left of the fee dispute was the division of that one-third between Royce and Needle. Judge Pallmeyer recognized that "any resolution by some decision-maker … is not going to make everybody happy," and a quick and efficient resolution was the best way to bring this never-ending case to a close without continuing to incur unnecessary litigation

costs. Both sides submitted simultaneous five-page briefs accompanied by large appendices in support of their positions. Needle contends that the district court erred in determining the division of the attorney's fee without a trial.

We review an attorney's fee award for an abuse of discretion. *Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 738 (7th Cir. 2010) (reviewing reasonableness of fees in fee petition for abuse of discretion). Though this attorney's fee dispute is not an assessment of the reasonableness of a fee petition, we see no practical difference that should demand a more stringent standard of review. Both are fact-intensive inquiries that are appropriate for the highly deferential standard given the district court's superior understanding of the litigation. *See Dunning v. Simmons Airlines, Inc.*, 62 F.3d 863, 872 (7th Cir. 1995). And just like with a fee award, a district court is "not obligated to conduct a line-by-line review of the bills to assess the charges for reasonableness." *Rexam*, 620 F.3d at 738. We have recognized "the impracticalities of requiring courts to do an item-by-item accounting." *Harper v. City of Chicago Heights*, 223 F.3d 593, 605 (7th Cir. 2000).

The co-counsel agreement provided that any attorney's fee "will be divided as follows: half of any such fee will be divided equally, regardless of time or effort of either of us, and the second half of any such fee will be divided in proportion to the time you and I have spent on this matter, regardless of any hourly rate." Thus, the fee division is subject to two parts: an equal split and a proportional split. Although fee-splitting agreements are subject to scrutiny under the rules of professional conduct, the court found that the co-counsel agreement's fee-splitting provision complied with the

relevant rules of ethics and was thus valid. Needle does not challenge that determination.

Turning to the second half of the fee-division formula—the proportional split—Needle sought a 75/25 split. The district court reviewed the parties' submissions and the associated billing records and then made a reasoned determination that the appropriate proportional split was 70/30 in Needle's favor, or five percent less than Needle claimed. He finds that determination riddled with error and injustice yet does not point to any specific or identifiable error. Rather, Needle asserts a general right to a "trial or referral" on this issue under Federal Rule of Civil Procedure 55(b)(2). He is mistaken. Rule 55(b) relates to default judgments; this was not a default judgment. And even then, the rule states only that a court *may* conduct a hearing if necessary, not that it must. That decision too rests within the discretion of the district court. *Dundee Cement Co. v. Howard Pipe & Concrete Prod., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). Needle was not entitled to a trial, so we need address only the reasonableness of the district court's decision.

We cannot overlook an important detail in this fee dispute: Royce kept detailed, contemporaneous billing records, whereas Needle did not. Instead, Needle determined the number of hours worked by examining his "electronic records … of telephone, email, and computer activities." Worse yet, Needle did not even begin preparing his reconstructed billing records until many months after the underlying RICO action was settled and dismissed. (And apparently, he was still in the midst of compiling his records of "time and activities in 2012 and 2013" years later in mid-2017.) Those reconstructed daily time entries covered nearly six years of

litigation. Further, Judge Pallmeyer noted that Needle's "daily entries for the month of August 2012 are identical to the daily entries for August 2013; his daily entries for November 2012 are identical to the daily entries for the following year, as well." And many of his entries were simply implausible: "On 11 days, he 'billed' more than 20 hours; on another 35 days, he billed 17 to 20 hours, and on 43 days he billed between 15 and 17 hours." Notwithstanding the fact that Needle's reliance on supposed billing records was on "shaky ground," the court estimated that the appropriate division for the proportional half of the fee formula was 70/30 in favor of Needle.

The district court thoroughly reviewed all of the relevant materials, which included extensive billing records, and made a reasonable determination based on the evidence. We hold that the district court did not abuse its discretion.

**G. The retainer payments**

The contingent fee agreement provided, in relevant part, that the attorney's fee was "one-third of any recovery actually received, less any retainer paid pursuant to Section V below." Royce and the *Amari* plaintiffs claimed that approximately $62,000 had been paid in retainer fees and should be deducted from the one-third share. Needle contested that the *Amari* plaintiffs had paid any retainer fees. The district court held an evidentiary hearing to resolve the dispute. Needle claims error but we detect none.

Needle fully participated in the evidentiary hearing, though not as counsel for Needle P.C. and only to represent his personal interests. During the hearing, Needle cross-examined the two witnesses presented—a representative of the

management committee for the *Amari* plaintiffs and Royce. Needle then presented himself as a witness and testified in narrative fashion. He was cross-examined as well. Needle also introduced exhibits during the evidentiary hearing.

After the evidentiary hearing, the district court ruled that the management committee and Needle authorized retainer payments totaling $62,789 and such fees were to be deducted from the share of the attorney's fee pursuant to the contingent fee agreement. As part of her decision, Judge Pallmeyer noted that she "d[id] not find Mr. Needle's position credible."

Needle had a full and fair opportunity to be heard on this issue and participate in the evidentiary hearing. And without him being able to articulate a definable error, we decline to disturb the district court's sound ruling. The retainer payments totaling $62,789 were properly deducted from the attorney's fee.

### H. Sanctions

The district court sanctioned Needle four times. One sanction was for filing a frivolous counterclaim in violation of Rule 11(b), and the other three were for vexatious and obstructive conduct under 28 U.S.C. § 1927. Needle does not appeal the amount of any sanction, just the fact that the court imposed each one. We review the Rule 11 sanction first and then take up the § 1927 sanctions together.

#### 1. Rule 11(b) sanction

The district court sanctioned Needle P.C. for filing counterclaims seeking a declaratory judgment that the attorney's fee is governed by section IV.1(A) of the contingent fee agreement—claims the court deemed legally frivolous. Federal Rule of Civil Procedure 11(b) requires that attorneys certify

"to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that their filings have adequate foundation in fact and law and lack an "improper purpose." Fed. R. Civ. P. 11(b). The rule "is principally designed to prevent baseless filings." *Brunt v. Serv. Emps. Int'l Union*, 284 F.3d 715, 721 (7th Cir. 2002). If the court determines that a lawyer or party has violated Rule 11(b), "the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c). We review the decision to impose Rule 11 sanctions for abuse of discretion. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 583 (7th Cir. 2019).

Needle P.C. was not sanctioned because its position turned out to be wrong, but because it was "frivolous, disregarding what anyone having taken a first-year contracts class could identify as the pivotal legal issues" and "utterly devoid of merit." There was no attempt to construe the contingent fee agreement "according to generally accepted principles of contract interpretation." Like here, Needle P.C. pointed to different dictionary definitions of "pursuant to," but "the only thing that mattered" was what the phrase meant in the contract. The contingent fee agreement and in turn the settlement agreement were both plain. The settlement agreement "[i]n no way could … be read to have made an award of attorneys' fee," and thus an alleged "separately negotiated" fee could not be "pursuant to any settlement agreement." Needle P.C.'s contract interpretation arguments were "legally frivolous." "Frivolous or legally unreasonable arguments … may incur [a Rule 11] penalty," *Berwick Grain Co. v. Ill. Dep't of Agric.*, 217 F.3d 502, 504 (7th Cir. 2000) (per curiam), and Needle P.C.'s did here.

The district court also found that Needle P.C. presented its counterclaims for an improper purpose. On several occasions the court "had admonished [Needle] that it did not see how those arguments could be presented consistently with Rule 11," yet Needle charged ahead with a "determined indifference to the legal merits of the case." "The very point of Rule 11 is to lend incentive for litigants 'to stop, think and investigate more carefully before serving and filing papers.'" *Berwick*, 217 F.3d at 505 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 398 (1990)). Needle disregarded both Rule 11 and the district court's warnings and filed the frivolous pleadings anyway, so "he has no basis to complain about the district court's decision to sanction him." *Id.*

### 2. Section 1927 sanctions

"Any attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Sanctions imposed pursuant to § 1927 are reviewed for an abuse of discretion. *Bell v. Vacuforce, LLC*, 908 F.3d 1075, 1081 (7th Cir. 2018).

Needle was sanctioned three separate times for vexatious conduct. We review each sanction "not in isolation but in light of 'the entire procedural history of the case.'" *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 643 (7th Cir. 2011) (quoting *Long v. Steepro*, 213 F.3d 983, 986 (7th Cir. 2000)). And when, as here, an attorney's "contumacious conduct threatens a court's ability to control its own proceedings," the district court's inherent authority to impose sanctions is "at its pinnacle." *Fuery v. City of Chicago*, 900 F.3d 450, 464 (7th Cir. 2018). The procedural history of this case more than supports the

sanctions—the record is "replete with delays, non-responses to court orders, and missed deadlines." *Patterson v. Coca–Cola Bottling Co.*, 852 F.2d 280, 284 (7th Cir. 1988) (per curiam) (affirming sanction of dismissal). In view of Needle's pattern of vexatious and obstructive conduct, the sanctions are easy to justify in this case. We briefly touch on each one.

First, the district court sanctioned Needle when he tried to attend a hearing telephonically from a courthouse in Philadelphia. Needle argues he should not be sanctioned for a "bad telephone connection" or an uncontrollable "telephone glitch." His attempt to shift blame is belied by the record. The court scheduled the hearing specifically to address Needle's pro hac vice application; his participation was indispensable. But Needle fails to recognize that the court permitted him to appear telephonically to accommodate *him*, not the other way around. Needle abused that accommodation by taking the call in a public place with too much ambient noise to participate in the hearing, forcing it to be rescheduled. The blame for the aborted hearing is Needle's alone. The court reasonably imposed modest sanctions—the costs of Royce's and the *Amari* plaintiffs' attendance, $600 and $700, respectively—for Needle unnecessarily multiplying the proceedings.

Second, Needle calls it an "egregious abuse of discretion" to sanction him for filing the second amended pleadings containing numerous substantive changes in violation of the court's order. This sanction speaks for itself. The court gave Needle leave to refile the second amended pleadings but explicitly instructed Needle not to make any substantive changes. The court's first order was unmistakable, but the court twice more held a hearing just to say it again. Despite three separate instructions, Needle flagrantly and

unashamedly disobeyed the court's order. The district court outlined the history of "Needle's continuing—and continuous—intransigence and of his obstructionist tactics" before finding that "the egregiousness of Needle's conduct" warrants both the "payment of the requested amount of $24,480 to Royce in partial recompense for the services rendered by his counsel" as well as a further sanction "to deal with the burdens thrust upon the judicial system by Needle's conduct" of "a like sum—again, $24,480—[to] be paid by Needle to the Clerk of Court for that reason." The sanction was reasonable compared to the vexatiousness of Needle's conduct.

Third, and finally, the court sanctioned Needle after he requested a two-week extension of time to file a brief. Because the court granted the extension, Needle characterizes this as a sanction merely for "asking" for it. Only by ignoring the surrounding circumstances can Needle make this argument. After Royce filed a motion to dismiss and for an order of default, Needle requested and the court gave him sixty days to respond. The court set a hearing for shortly after Needle's response was due. The day before the filing deadline Needle asked for an extension. The reason, he claimed, was that the previous day, or the fifty-eighth day of his response time, Needle realized that he had not ordered a hearing transcript that he felt was necessary for his response. There is no explanation for why it took fifty-eight days to look for this supposedly critical transcript. Although the court granted the two-week extension, it also imposed the reasonable costs and fees that opposing counsel incurred as a result of Needle's conduct further delaying the matter and requiring the additional appearance at the preset hearing. And contrary to Needle's belief, there is nothing inconsistent with a court both granting an extension of time and assessing the costs incurred due to

the extension against the requester, especially on the record in this case. Needle had a long history of delaying the proceedings and sanctions were appropriate for unreasonably causing further delay.

The district court acted reasonably—and with considerable restraint—in each instance by sanctioning Needle for his conduct. We find no abuse of discretion whatsoever.

### III. Conclusion

This relatively straightforward attorney's fee dispute governed by contract was made exceedingly difficult by one attorney who took a frivolous legal position and turned it into a multiyear litigation rife with delays and misconduct. The district court did not err in its rulings or abuse its discretion in imposing sanctions. The district court's judgment is

AFFIRMED.